**POWERS PYLES SUTTER & VERVILLE, P.C.**
1501 M Street, NW - Seventh Floor
Washington, D.C. 20005
Tel: (202) 466-6550

**LITTLER MENDELSON, P.C.**
One Newark Center - Eighth Floor
Newark, New Jersey  07102
Tel: (973) 848-4700

Attorneys for Defendants
   The Chubb Institute and
   High-Tech Institute, Inc.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA, and ex rel. MARY BETH PILECKI-SIMKO and TOM GIUNTA, <br><br>         Plaintiffs, <br><br>         v. <br><br> THE CHUBB INSTITUTE, THE CHUBB CORPORATION, CHUBB AMERICA SERVICE CORPORATION, and HIGH-TECH INSTITUTE, INC., <br><br>         Defendants. | Civil Action No. 06-3562 (HAA) (MF) <br><br> **Document Electronically Filed** |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION OF
## THE CHUBB INSTITUTE AND HIGH-TECH INSTITUTE, INC.,
## TO DISMISS THE SECOND AMENDED COMPLAINT

TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................... i

I.     INTRODUCTION .............................................. 1

II.    THE SECOND AMENDED COMPLAINT ............................. 2

       A. Legal Claims ........................................ 2

          1. Higher Education Act and Title IV Funds ............ 2

          2. Nature of Claims Asserted ......................... 5

       B. Factual Allegations ................................. 6

          1. Job Placement Numbers ............................. 7

          2. Admissions Criteria ............................... 9

          3. Satisfactory Academic Progress .................... 9

          4. Incentive Payments to Recruiters .................. 10

          5. Student Eligibility ............................... 11

III.   LEGAL THEORIES OF FALSE CLAIMS ACT VIOLATIONS ........... 12

       A. Factually False Claims .............................. 14

       B. Promissory Fraud ................................... 14

       C. False Certification ................................. 17

          1. Express False Certification ....................... 17

          2. Implied False Certification ....................... 18

IV.    THE SECOND AMENDED COMPLAINT FAILS TO SATISFY THE PLEADING
       REQUIREMENTS UNDER ANY THEORY OF FALSE CLAIMS ACT
       LIABILITY ............................................... 19

       A. Job Placement Numbers ............................... 19

B. Admissions Criteria ................................... 23

C. Satisfactory Academic Progress ........................ 24

D. Student Eligibility .................................. 25

E. Incentive Compensation ............................... 26

V.   THE SECOND AMENDED COMPLAINT FAILS TO ALLEGE A CONSPIRACY
     TO VIOLATE THE FALSE CLAIMS ACT ......................... 32

VI.  THERE ARE NO FACTUAL ALLEGATIONS THAT HIGH-TECH INSTITUTE
     PERFORMED ANY ACT AT ALL TO SUPPORT THE IMPOSITION OF
     LIABILITY AGAINST IT UNDER ANY THEORY OF THE CASE ....... 33

VII. TO THE EXTENT THAT THE SECOND AMENDED COMPLAINT SEEKS
     DAMAGES BASED ON GOVERNMENT-INSURED LOANS, IT FAILS TO
     STATE A CAUSE OF ACTION ................................. 38

VIII CONCLUSION ............................................. 40

## TABLE OF AUTHORITIES

**Cases**

Allison Engine Co., Inc. v. United States ex rel. Sanders,
  128 S.Ct. 2123 (2008) ........................................ 6

Board of Trustees of Teamsters Local 863 Pension Fund v.
  Foodtown, Inc.,
  296 F.3d 164 (3d Cir. 2002) ................................ 37

Bower v. Jones,
  978 F.2d 1004 (7th Cir. 1992) .............................. 15

In re Burlington Coat Factory Securities Litigation,
  114 F.3d 1410 (3d Cir. 1997) .............................. 24

Craig v. Lake Asbestos of Quebec, Ltd.,
  843 F.2d 145 (3d Cir. 1988) ................................ 37

Deutsche Credit Corporation v. Case Power & Equipment Co.,
  876 P.2d 1190 (Ariz. 1994) ................................ 37

Fogie v. Thorn Americas, Inc.,
  190 F.3d 889 (8th Cir. 1999) .............................. 32

Gatecliff v. Great Republic Life Insurance Co.,
  821 P.2d 725 (Ariz. 1991) ................................. 37

Ideal Dairy Farms, Inc. v. John Labatt, LTD.,
  90 F.3d 737 (3d Cir. 1996) ................................ 32

Ohai v. Verizon Communications, Inc.,
  No. 05-729 (D.N.J. Oct. 24, 2005) ......................... 37

Platten v. HG Bermuda Exempted Limited,
  437 F.3d 118 (1st Cir. 2006) .............................. 32

Premier Pork, LLC v. Westin, Inc.,
  2008 WL 724352 (D.N.J. Mar. 17, 2008) ..................... 36

Rockefeller Ctr. Props. Secs. Litig.,
  311 F.3d 198 (3d Cir. 2002) ............................... 24

iii

Sonnenblick-Goldman C. v. ITT Corp. et al.,
  912 F.Supp. 85 (S.D.N.Y. 1996) ............................ 36

United States ex rel. Atkinson v. Pennsylvania Shipbuilding
Company,
  2000 WL 1207162 (E.D.Pa. Aug. 24, 2000) ..................... 15

United States ex rel. Bott v. Silicon Valley Colleges,
  262 Fed.Appx. 810 (9th Cir. 2008) ....................... 13, 27

United States ex rel. Cooper v. Gentiva Health Services, Inc.,
  2003 WL 22495607 (W.D. Pa. Nov. 4, 2003) ................ 17, 20

United States ex rel. Gay v. Lincoln Technical Institute, Inc.,
  2003 WL 22474586 (N.D. Tex. Sept. 3, 2003) ......... 13, 15, 39,
  40

United States ex rel. Graves v. ITT Educational Services, Inc.,
  284 F.Supp.2d 487 (S.D. Tex. 2003) ..... 13, 14, 15, 29, 30, 31,
  39

United States ex rel. Hendow v. University of Phoenix,
  461 F.3d 1166 (9th Cir. 2006) ............................... 13

United States ex rel. Hopper v. Anton,
  91 F.3d 1261 (9th Cir. 1996) ....................... 13, 14, 15

United States ex rel. Main v. Oakland City University,
  426 F.3d 914 (7th Cir. 2005)("Main") ................ 13, 15, 31

United States ex rel. Marcus v. Hess,
  317 U.S. 537 (1943) ........................................ 14

United States ex rel. Mikes v. Straus,
  274 F.3d 687 (2d Cir. 2001)("Mikes") ............... 14, 17, 18

United States v. Rivera,
  55 F.3d 703 (1st Cir. 1995) ................................ 39

United States ex rel. Rodriguez v. Our Lady of Lourdes Medical
Center,
  552 F.3d 297 (3d Cir. 2009)("Rodriguez") ........... 17, 19, 22

United States v. Vanoosterhout,
  898 F.Supp. 25 (D.D.C. 1995) ............................... 39

United States ex rel. Watson v. Connecticut General Life
   Insurance Company,
   2003 WL 303142 (E.D. Pa. Feb. 11, 2003) ..................... 17

**Statutes**
20 U.S.C. § 1087d ....................................... 12, 24
20 U.S.C. § 1090 ............................................ 24
20 U.S.C. § 1091 ............................................ 10
20 U.S.C. § 1094 ....................................... 10, 11, 24
20 U.S.C. § 1094(a)(20) ........................... 3, 28, 29, 30
31 U.S.C. § 3729 ............................................. 5
31 U.S.C. § 3729(a)(1) .................................... 5, 29
31 U.S.C. § 3729(a)(2) .................................... 6, 29
31 U.S.C. § 3729(a)(3) .................................... 6, 32
31 U.S.C. § 3729(a)(7) ...................................... 29
34 C.F.R. § 600 ............................................. 3
34 C.F.R. § 602 ............................................. 3
34 C.F.R. § 668 ............................................. 3
34 C.F.R. § 668.14(b)(22) .......................... 3, 11, 26, 27
34 C.F.R. § 668.31 et seq. ................................... 3
34 C.F.R. § 668.32 ...................................... 10, 24
34 C.F.R. § 668.71 ..................................... 7, 9, 20, 22
34 C.F.R. § 668.163 ......................................... 4
34 C.F.R. § 668.164 ......................................... 4
34 C.F.R. § 668.166 ......................................... 4
34 C.F.R. § 673-676 ......................................... 3
34 C.F.R. § 682 ............................................. 3
34 C.F.R. § 685 ............................................. 3
34 C.F.R. § 690 ............................................. 3
34 C.F.R. § 692 ............................................. 3
34 C.F.R. Subpart G ................................... 4, 21, 26
34 C.F.R. Subpart H ........................................ 26
Higher Education Act of 1965 ........................... passim
Higher Education Act § 487(a)(2) ........................... 26
Higher Education Act § 487(a)(20) .......................... 11

## I.     INTRODUCTION

Plaintiffs, two former employees of defendant, The Chubb
Institute, filed this action on behalf of the United States on
August 2, 2006.  On August 19, 2008, the United States filed a
Notice of Election to Decline Intervention.  A First Amended
Complaint ("FAC") was served on defendants, but is not reflected
on the electronic docket.  Defendants The Chubb Institute and
High-Tech Institute, Inc., moved to dismiss the FAC for failure
to plead fraud with particularity or state a cause of action.
Plaintiffs responded by seeking leave to file a Second Amended
Complaint ("SAC").  Upon receipt of the SAC, defendants
consented to the filing of the SAC, reserving the right to
challenge its sufficiency.  Defendants The Chubb Institute and
High-Tech Institute hereby seek the dismissal of the SAC.[1]

The gravamen of the SAC is that The Chubb Institute
committed acts that were in violation various regulatory
requirements applicable to the federal student aid programs,
that those violations would have resulted in the U.S. Department
of Education's terminating the schools' eligibility to
participate in the federal student aid programs had the
Department known about them, that the schools' students would

---

[1]   The Chubb Institute and High-Tech Institute also adopt the
motion filed by The Chubb Corporation to the extent applicable
to these defendants.

not have been eligible to receive federal student aid funds if

the schools had been terminated from the eligibility to

participate in the federal student aid programs, and that

therefore the schools submitted false claims to the government

when they drew down federal grant funds for their students from

the Department of Education or certified student applications

for federally-backed loans from private lenders.  For the

reasons set forth below, those claims do not state claims for

which relief can be granted under the False Claims Act ("FCA").

## II.   THE SECOND AMENDED COMPLAINT

### A.   Legal Claims

#### 1.   Higher Education Act and Title IV Funds

The SAC alleges the framework of the statutory and

regulatory provisions that govern the award of financial

assistance to students under Title IV of the Higher Education

Act of 1965 ("HEA").  *See* ¶¶ 9 through 23.  Student financial

assistance under the HEA takes the form of grants or loans,

available to "eligible students" attending an "eligible

institution."  To qualify as an eligible institution, a school

must be certified as such by, and enter into a Program

Participation Agreement ("PPA") with, the Secretary of

Education.  The PPA provides, among other things, that the

school agrees to comply with the HEA and all regulations

thereunder.[2]  One such provision limits incentive compensation
for recruiters.  *See* 20 U.S.C. § 1094(a)(20); 34 C.F.R. §
668.14(b)(22).  Other provisions set forth eligibility
requirements for students.[3]  *See* 34 C.F.R. § 668.31 et seq.

The Chubb schools are and have been at all relevant times
certified as eligible institutions by the Department of
Education, and have entered into a PPA with it, as the SAC
acknowledges.  Among other things, the HEA requires that an
eligible institution must be accredited by a nationally
recognized accrediting agency.  *See* 20 U.S.C. § 1001(a)(5).  The
Chubb Institute is and all relevant times has been accredited by
the Accrediting Commission of Career Schools and Colleges of
Technology ("ACCSCT"), as the SAC acknowledges.

Once an institution has been determined to be an eligible
institution, its qualified students may receive financial
assistance under the HEA.  An institution remains eligible
unless and until the Department of Education suspends or
terminates its eligibility, pursuant to procedures set forth at

---

[2] The regulations comprising a volume of the Code of Federal
Regulations, are set forth at 34 C.F.R. Parts 600, 602, 668,
673-676, 682, 685, 690 and 692.

[3] These include:  U.S. citizenship or status as an eligible non-
citizen; a social security number; a high school diploma or GED;
compliance with U.S. Selective Service requirements; no
conviction for a drug offense; and satisfactory academic
progress toward completing the program of study.

34 C.F.R. Subpart G.  The SAC does not allege that The Chubb Institute's eligibility has ever been suspended or terminated.

According to the SAC, financial assistance provided pursuant to the HEA includes grants, such as Pell Grants, and loans, such as Perkins Loans, Federal Stafford Loans, Federal PLUS Loans, Direct Subsidized Loans, Direct Unsubsidized Loans, and Direct PLUS Loans.  (¶ 12).  Depending on the nature of the assistance, the institution submits a request for student grant funds to the United States Department of Education or submits a loan application to a third-party intermediary lender, which transfers the funds to a federal funds account held by the institution for disbursement to or on behalf of the student within three days.  See 34 C.F.R. § 668.163, 164 and 166.[4]

The United States pays interest on government-insured loans while the students are enrolled in classes and during authorized grace periods.  However, the funds for the loan are furnished by the private lender, not the United States.  If a student defaults, a guarantee agency reimburses the lender.  It is only in the event that the guarantee agency cannot collect from the

---

[4] The SAC alleges in paragraph 10 of the SAC that the federal aid funds "do not go to the students" but are used only to satisfy tuition at the school.  On the contrary, the funds are initially transferred by the U.S. or lender to an institution's federal funds account and then disbursed to pay tuition and fees, and the excess is paid to the student or, with the student's consent, held in a credit balance account for the student's benefit.  34 C.F.R. 668.164.

student that the Department of Education disburses funds to reimburse the guarantee agency.  (¶¶ 40, 41, 42).

       2.   Nature of Claims Asserted

The SAC is based on alleged violations of the FCA (31 U.S.C. § 3729). The alleged violations fall into two broad categories.  The first is that Chubb's[5] claims for financial aid on behalf of its students were false because it allegedly had submitted documentation to its accrediting agency, ACCSCT, which misrepresented job placement information concerning its graduates, allegedly rendering Chubb's students ineligible to receive federal student aid funds.  (¶ 24(i)).  The second is that Chubb's claims for financial aid were false because it allegedly had violated federal regulations concerning misrepresentations to students in connection with their enrollment, satisfactory academic progress, admissions criteria, and compensation of student recruiters, allegedly rendering its students ineligible to receive federal student aid funds.  (¶¶ 24(ii), 24 (iii), 24(iv), 24(v) and 24(vi)).

The SAC asserts three FCA claims.  The first is that the defendants violated 31 U.S.C. § 3729(a)(1) by presenting or causing to be presented claims with knowledge of their falsity. This section "requires a plaintiff to prove that the defendant

---

[5] Plaintiffs use the term "Chubb" to refer to defendants The Chubb Institute, The Chubb Corporation and Chubb America Service Corporation.  SAC ¶ 6.  Defendants adopt this definition.

"present[ed]" a false or fraudulent claim to the Government."
*Allison Engine Co., Inc. v. United States ex rel. Sanders*, 128
S.Ct. 2123, 2129 (2008). The second claim is based upon 31
U.S.C. § 3729(a)(2) under which the defendant need not have
caused the false record or statement to be presented to the
Government. Rather, this section requires that the defendant
made a false record or statement "for the purpose of getting "a
false or fraudulent claim paid or approved by the Government."
*Allison Engine Co., Inc.*, at 2130. The third claim alleges that
the defendants conspired to defraud the government by getting
false or fraudulent claims paid in violation of 31 U.S.C. §
3729(a)(3).

The SAC also contains two claims against High-Tech
Institute that were not in the FAC. Defendant High-Tech had
argued in its Motion to Dismiss the FAC that there were no
allegations in the FAC that High-Tech performed any acts that
would subject it to liability under the FCA. In apparent
response to this argument, plaintiffs have added claims against
High-Tech based on piercing the corporate veil (¶¶ 106-112) and
successor liability (¶¶ 113-119).

    B.   Factual Allegations

The Chubb Institute is a technical career training
institution, offering programs in a variety of areas. (¶¶ 6,
28). It was owned by The Chubb Corporation until either

September 2004 (according to ¶ 6) or January 2004 (according to ¶ 7) when it was sold to High-Tech Institute.  Plaintiffs allege that "since in and around November 2001" Chubb made a number of misrepresentations to prospective students, enrolled students, the Secretary of Education, and ACCSCT.  These alleged misrepresentations fall into five categories.

>    1.   Job Placement Numbers

Plaintiffs allege that Chubb students received financial aid after Chubb "misrepresented to prospective students, the accreditation agencies and the federal government with false certifications, assurances and records the nature of Chubb's programs and externships, the employability of its graduates and its employment placement services and placement numbers." ¶ 24(ii).[6] Plaintiffs allege that **the students**, not the government, relied on these misrepresentations to their detriment in deciding to enroll at Chubb and apply for Title IV assistance.  They cite to 34 C.F.R. § 668.71 in support of this allegation.

---

[6]Nowhere in the SAC do plaintiffs specify any particular statement to any particular student or to the government concerning any of these items.  The only particular statements that are identified are to ACCSCT.  Those only concern job placement information, and they do not allege what the correct placement data was.  In fact, they do not even allege that that the data submitted was such that it failed to satisfy the ACCSCT guidelines concerning acceptable placement data.

The SAC expands on this allegation in a section entitled "Chubb Made Misrepresentations to Prospective Students, The Accreditation Agencies and The Federal Government about Job Placement Numbers in Certifications and Assurances." ¶¶ 52 to 59.  According to plaintiffs, Chubb misrepresented to prospective students placement numbers and its ability to make placements for students.  It also misrepresented job placement numbers in certifications and assurances to ACCSCT and the federal government.[7]  Plaintiffs allege that ACCSCT requires a job placement rate of 70%.  Students allegedly were told by admission representatives that the school's placement numbers were 85% to 90%, but that these figures were based on false placement data.  No information is provided about the "true" placement numbers.  In addition, admission representatives allegedly made oral guarantees of job placement to prospective students despite a statement in the "enrollment agreement" that no such guarantees had been made.  Despite these guarantees, students were counted as placed when they were placed in jobs

---

[7] One of the two major differences between the FAC and the SAC is the addition of specific allegations about the certifications made to ACCSCT.  See ¶¶ 24(i)(a)-(g).  The bulk of the exhibits that were added to the SAC are documents submitted to ACCSCT. As noted in footnote 6, the SAC contains no specification of any statement by Chubb to the government concerning a false statement about student job placement, and even as to ACCSCT, it fails to allege what the supposedly correct data would have showed or that it would have failed to satisfy ACCSCT guidelines.

that were unrelated to their curriculum.   There is also an
allegation that Chubb misrepresented to prospective students for
medical billing and coding that Chubb had a placement referral
base when it did not.[8]

These misrepresentations allegedly increased Chubb's
enrollments numbers, and fraudulently enabled Chubb to "obtain
accreditation" and therefore to obtain Title IV funds. (¶ 59).

### 2.   Admissions Criteria

Plaintiffs allege that Chubb also caused the presentation
of students' claims for financial aid after misrepresenting to
the students whether they met Chubb's own admission criteria and
whether they could benefit from the education it offered.[9]   By
allegedly changing admission test scores and admitting students
who could not speak and write English fluently, Chubb allegedly
violated ACCSCT standards of accreditation.   ¶ 24(iv).
Plaintiffs cite to 34 C.F.R. § 668.71 in support of this
allegation.   *See* ¶¶ 60 to 67.

### 3.   Satisfactory Academic Progress

Plaintiffs allege that Chubb also caused the presentation
of students' claims for financial aid after misrepresenting to
the students, the accreditation agencies and the federal

---

[8] The SAC is devoid of any particularity as to who made these
representations, to whom they were made, or when they were made.
[9] The SAC is devoid of any particularity as to who made these
representations, to whom they were made, or when they were made.

government that the students were making satisfactory academic
progress toward completing their program of study despite the
fact that its programs were taught open book and answers to
tests were given to students in advance.[10]   ¶ 24(iii).
Plaintiffs also allege that students whose grades would make
them ineligible for Title IV programs had their grades
fraudulently raised and that teachers were pressured to change
the grade curve of the classes so more students would pass. ¶¶
68-72.[11]   Plaintiffs cite to 20 U.S.C. §§ 1091 and 1094 and 34
C.F.R. §668.32 in support of this allegation, alleging that
Chubb must provide a statement that certifies the eligibility of
any student who receives a loan.  (¶ 72).

4.   Incentive Payments to Recruiters

Plaintiffs allege that Chubb also caused the presentation
of students' claims for financial aid after misrepresenting to
the students, the accreditation agencies and the federal
government with false certifications, assurances and records
that it was in compliance with the prohibition against providing
"any commission, bonus or other incentive payment to recruiters

_____

[10] The SAC does not identify any particular statement to the
government, any accrediting agency, or any student concerning
satisfactory academic progress.  Nor is there any specificity as
to which Chubb employees gave test answers to which students.
[11] The SAC does not identify a single instance of the alleged
activity it alleges occurred, a single instructor who gave false
grades, or a single employee who pressured another into doing
something wrong.

based on recruiting activities." ¶ 24(vi).[12]  Plaintiffs cite to
§ 487(a)(20) of the HEA in support of this allegation.[13]

The incentive payment allegations of the SAC (¶¶ 73 to 79)
generally describe aspects of the school's compensation system.[14]
Plaintiffs allege that Chubb has compensated admission
representatives based directly on enrollment activities "since
at least 1998-2004," and that Chubb's performance ratings rely
on enrollment activity.  The exhibits attached to the SAC
regarding the incentive compensation plan include the plan
itself.  Plaintiffs allege that the top ranking counselors are
among the highest paid counselors and that they receive
incentive trips, awards and gifts based on enrollment numbers.
All of these activities are alleged to violate the incentive
payment ban that is part of the PPA that Chubb signed when it
first became an eligible institution.

    5.   Student Eligibility

Plaintiffs allege that Chubb admitted and allowed students
who were ineligible for Title IV assistance to apply even though
they were illegal non-citizens, did not have valid social

---

[12] The SAC does not specify a single instance where Chubb
allegedly made such a statement of compliance to any student,
accrediting agency, or the government.
[13] Section 487 of the HEA is codified at 20 U.S.C. § 1094.  The
implementing regulations are at 34 C.F.R. § 668.14(b)(22).
[14] The second major difference between the FAC and the SAC is the
incorporation of documents regarding the incentive compensation
plan.  See ¶ 87 and Exhibit F to SAC.

security numbers, did not comply with the U.S. selective service registration requirements, and did not have a high school diploma or G.E.D.[15]  ¶ 24(v).  Plaintiffs allege that Chubb caused the filing and presentation of claims for financial aid for students who were ineligible to receive Title IV funds by falsely certifying the eligibility of its students pursuant to 20 U.S.C. § 1087d.[16]

In the specific section of the SAC that details the allegations about filing false claims for students that were ineligible for Title IV assistance (¶¶ 80 to 85), plaintiffs merely set forth the five criteria listed above as well as the requirement that the student has not been convicted of a drug offense and that the student sign the required certification forms.  They then allege that students who did not meet these criteria had financial aid forms submitted by Chubb.[17]

### III. LEGAL THEORIES OF FALSE CLAIMS ACT VIOLATIONS

Education, like health care, is highly dependent on federal programs.  The resultant regulatory minefield has spawned a

---

[15] Interestingly, there is no allegation that any of these students received Title IV funds.

[16] Plaintiffs also cite "Title IV/HEA Sec. 454(a)(1)(C)" in support of the certification requirement.  This section is codified in 20 U.S.C. § 1087d.  Therefore, while plaintiffs claim that there are two statutes that require certification of eligibility, the two sections are, in fact, one and the same.

[17] As with all their other conclusory allegations, plaintiffs do not in the SAC allege a single instance of when or how this allegedly happened, or identify a single student or Chubb employee involved.

number of *qui tam* lawsuits.[18]  The task for the courts confronted

with such cases based upon alleged regulatory violations, is to

determine which violations rise to the level of a False Claim

and which do not.  The courts have made it abundantly clear that

not every regulatory violation translates into a false claim.

> It is not the case that any breach of contract, or
> violation of regulations or law, or receipt of money from the
> government where one is not entitled to receive the money,
> automatically gives rise to a claim under the FCA… The FCA is
> far narrower… This does not mean that other types of violations
> of regulations…are not remediable; it merely means that such are
> not remediable under the FCA.

*Hopper at* 1265 (quoting from District Court's order).

Three theories of false claims have been developed by the

courts to ensure that only those violations that impact the

government's financial interests are subject to FCA lawsuits.

Central to each theory is the concept that the claim must

involve a false statement, assertion or certification that is

relevant to the government's decision to confer a benefit.  The

SAC fails to state a claim under any of these theories.

---

[18] *See e.g. United States ex rel. Bott v. Silicon Valley Colleges*,
262 Fed.Appx. 810 (9th Cir. 2008)("*Bott*")(Exhibit 1, attached
hereto); United *States ex rel. Hendow v. University of Phoenix*,
461 F.3d 1166 (9th Cir. 2006)("*Hendow*"); *United States ex rel.
Main v. Oakland City University*, 426 F.3d 914 (7th Cir.
2005)("*Main*"); *United States ex rel. Hopper v. Anton*, 91 F.3d
1261(9th Cir. 1996)("*Hopper*"); *United States ex rel. Graves v.
ITT Educational Services, Inc.*, 284 F.Supp.2d 487 (S.D. Tex.
2003)("*Graves*"); *United States ex rel. Gay v. Lincoln Technical
Institute, Inc.*, 2003 WL 22474586 (N.D. Tex. Sept. 3,
2003)("*Gay*"). (Exhibit 2, attached hereto).

A.   Factually False Claims

The archetypal False Claims Act case involves claims that themselves are factually false because the goods or services were not provided or did not conform to government specifications.  *See Hopper* at 1265; *United States ex rel. Mikes v. Straus*, 274 F.3d 687, 697 (2d Cir. 2001)("*Mikes*").  The SAC contains no allegations that defendants submitted such claims. They do not allege that defendants sought funds for students who were not enrolled or that any particular application for student aid contained false information.

B.   Promissory Fraud

The promissory fraud theory[19] premises liability on claims that were submitted pursuant to a contract that was originally obtained through false statements or fraudulent conduct.  "The claims for payment may be accurate, but the antecedent fraud in obtaining the contract makes each claim submitted a false or fraudulent claim."  *Graves* at 496. The theory has its roots in the case of *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 542 (1943) in which government contractors were held to be liable for false claims that were submitted under government contracts that had been obtained by collusive bidding.  However, "courts have emphasized that promissory fraud is a 'rare' basis

---

[19] This theory is also referred to as "fraud in the inducement." *See Graves* at 502-03.

for liability under the False Claims Act." *Graves* at 503, *Hopper* at 1267.  Central to the promissory fraud theory is the requirement that at the time the defendants entered into the contract with the government, they knew that the acts they committed were forbidden under the contract, but that they planned to continue committing those acts when they signed the contract.  *Graves* at 503; *Main* at 917; *Gay* 2003 WL 22474586, at *4; *Hopper* at 1267.

Moreover, a complaint that relies on the promissory fraud theory must contain more than just a conclusory allegation that the defendants had such an intent when they signed the contract.  Particularity is required to avoid dismissal.  As the court stated in *United States ex rel. Atkinson v. Pennsylvania Shipbuilding Company*, 2000 WL 1207162, at *9 (E.D.Pa. Aug. 24, 2000) (Exhibit 3, attached hereto).

If the falsity of a statement that was made to get a fraudulent claim approved turns on what a defendant intended, that intent—or facts giving rise to a strong inference of that intent—must be pleaded with sufficient particularity to satisfy the requirements of the first sentence of Rule 9(b).

*See Bower v. Jones*, 978 F.2d 1004, 1012 (7th Cir. 1992) (requiring allegations of objective manifestations of intent not to perform contract for a claim of promissory fraud to survive a motion to dismiss); *Gay* at 2003 WL 22474586, at *4.

It is important to note that the Third Circuit has not adopted or even discussed the promissory fraud theory of false

claims in any of its decisions.  The absence of any such decision validates the observation of the courts in *Graves* and *Hopper* that the utilization of the theory is rare.

While hardly a model of clarity, the SAC apparently attempts to plead the promissory fraud theory in ¶ 24(i): "Chubb violated the False Claims Act…by causing the filing and presentation of Chubb students' claims for financial aid from Title IV/HEA financial aid programs when and/or after Chubb's violations of federal statutes and regulations governing the participation of institutions of higher education in Title IV/HEA programs made Chubb ineligible to receive Title IV/HEA program funds for its students."

Plaintiffs' claim therefore appears to be that, because it allegedly was in violation of various federal regulations concerning misrepresentations to students, satisfactory academic progress, being truthful with accrediting agencies, and incentive compensation, it was in violation of its PPA, which was the basis for its students' obtaining federal student aid.

As the court cases make clear, however, a claim based on promissory fraud cannot succeed unless it is demonstrated that, at the time the PPA was entered into, the school entering into did so with the intent of not complying with it.  The SAC simply contains no such allegations.

C.   False Certification

The Third Circuit has yet to adopt the theory of false
certification as a basis for liability under the False Claims
Act.  *See United States ex rel. Rodriguez v. Our Lady of Lourdes
Medical Center*, 552 F.3d 297, 303-04 (3d Cir. 2009)(*"Rodriguez"*)
However, the Third Circuit and several district courts within
the Circuit have analyzed the sufficiency of a complaint under
the theory.  *See Rodriguez; United States ex rel. Cooper v.
Gentiva Health Services, Inc.*, 2003 WL 22495607 (W.D. Pa. Nov.
4, 2003)(*"Cooper"*)(Exhibit 4, attached hereto); *United States ex
rel. Watson v. Connecticut General Life Insurance Company*, 2003
WL 303142 (E.D. Pa. Feb. 11, 2003)(*"Watson"*)(Exhibit 5, attached
hereto).  These cases consider two versions of false
certification, express and implied.

1.   Express False Certification

An express false certification claim is, "as the term
suggests, a claim that falsely certifies compliance with a
particular statute, regulation or contractual term, where
compliance is a prerequisite to payment."  *Mikes at* 697-98.[20]
Therefore, an analysis of the sufficiency of the allegations of
a complaint under this version of the false certification theory

---

[20] *Mikes* is the seminal case discussing the express and implied
false certification theories.  The Third Circuit decision in
*Rodriguez* relied heavily on the analysis in *Mikes*.  The decision
in *Mikes* also provided the framework for the analysis of the
district court in *Cooper*.

involves the explicit language of the certification that
accompanies the claim.

        2.   Implied False Certification

    The concept of implied false certification is more complex.
The Court in *Mikes* explained that it "is based on the notion
that the act of submitting a claim for reimbursement itself
implies compliance with governing federal rules that are a
precondition of payment." *Mikes* at 699. Recognizing that
extending this theory too far would turn the False Claims Act
into a "blunt instrument to enforce compliance with all medical
regulations," the Second Circuit limited the circumstances under
which the implied false certification theory could be applied:

    Specifically, implied false certification is appropriately
applied only when the underlying statute or regulation upon
which the plaintiff relies *expressly* states the provider must
comply in order to be paid... Liability under the Act may properly
be found therefore when a defendant submits a claim for
reimbursement while knowing...that payment expressly is precluded
because of some noncompliance by the defendant.

*Mikes* at 700-01.[21]  As the Third Circuit explained in *Rodriguez*,

"[t]o state a claim under that theory, it is necessary to allege

not only a receipt of federal funds and a failure to comply with

applicable regulations, but also that payment of the federal

funds was in some way conditioned on compliance with those

regulations…Otherwise, the False Claims Act would be turned into

'a blunt instrument to enforce compliance with all…regulations'

rather than 'only those regulations that are a pre-condition to

payment.'"  *Rodriguez* at 304.

## IV.  THE SECOND AMENDED COMPLAINT FAILS TO SATISFY THE PLEADING REQUIREMENTS UNDER ANY THEORY OF FALSE CLAIMS ACT LIABILITY

---

[21] Although neither the Second Circuit in *Mikes* nor the Third
Circuit in *Rodriguez* discuss the promissory fraud theory, the
limitation imposed by mandating that the statute expressly
requires compliance in order to be paid is necessary in order to
avoid completely undermining the carefully crafted limitations
of the promissory fraud theory.  The promissory fraud theory is
premised on the fact that the agreement under which payments are
sought includes a provision that the recipient of federal funds
promises to abide by all applicable statutes and regulations.
As discussed previously, to avoid turning every instance of non-
compliance with a regulation into a false claim, the promissory
fraud theory requires an intent to violate the regulations at
the time the agreement was made.  If the implied false
certification theory permitted liability to be imposed under the
False Claims Act based solely on the implicit certification of
continued adherence to "eligibility" requirements of a federal
program whenever a subsequent request for payment is made, it
would in essence strip the "intent not to comply" requirement
from the promissory fraud theory.  It would allow a false claim
case to be brought based solely on an initial promise to comply
in the eligibility agreement followed by a non-compliance with
some regulation and a request for payment.  This is exactly what
the courts in *Graves*, *Main*, *Hendow and Hopper* did not allow.

As noted above, plaintiffs allege five categories of misrepresentations by defendants, none of which satisfy the requirements under any theory of liability under the False Claims Act.

A.   Job Placement Numbers

Plaintiffs allege that Chubb overstated its graduates' job placement success to its students and to ACCSCT.  As to students, the SAC alleges that "ACCSCT requires 70% job placement overall for Chubb," that recruiters told applicants "that the school's placement numbers were 85-90%," and that "these numbers were based on false placement data." ¶54.  As to ACCSCT, the SAC added several new paragraphs (¶¶ 24(i)(a)-(g)) in which it is alleged that documents identified in these paragraphs contained misrepresentations regarding the job placement numbers.  For example, plaintiffs identify a report submitted on January 14, 2004 to ACCSCT that misrepresented the correct job numbers of students placed in their field of study with the purpose of obtaining accreditation. (¶ 24(i)(c)). As previously pointed out, the SAC nowhere alleges what the supposedly correct placement rates were, or even the extent to which Chubb overstated the rates.

As the cases on false certification make abundantly clear, the starting point for analyzing the sufficiency of the allegations is the statutes and regulations.  "To properly

analyze [plaintiff's claims], the court first must identify the regulatory, statutory, and/or contractual standards to which the Defendant allegedly certified." *Cooper*, 2003 WL 22495607, at *3.

Plaintiffs cite to 34 C.F.R. § 668.71 as the regulatory support for their job placement allegations.  However, this regulation does not meet the standards required under either the express or implied certification theories.  It merely "establishes the standards and rules by which the Secretary may initiate a proceeding…against an otherwise eligible institution for any **substantial** misrepresentation made by the institution regarding…the employability of its graduates." (Emphasis added). Not only is this a far cry from a certification requirement, it strongly suggests that issues relating to misrepresentations about employability are to be handled through the proceedings established by the regulation. If, under the regulatory scheme, there is an alleged misrepresentation to students, the Department of Education can initiate a proceeding to fine, limit, suspend or terminate a school's participation in the Title IV programs.  Those proceedings are governed by 34 C.F.R. Subpart G.  Title IV eligibility remains in place during the course of the proceeding and any subsequent appeal to the Secretary.  The government bears the burden of establishing the violation and the appropriateness of the sanction.  Here,

plaintiffs seek make general, conclusory, unsubstantiated statements about alleged misrepresentations; suggest that such allegations, if proven, would automatically disqualify Chubb as an eligible institution; and seek to use the FCA to have the court substitute itself for the Department of Education in making the determination.  This is precisely the situation which the case law instructs the FCA does not cover.

Moreover, the allegations in the SAC give no indication whether the alleged misrepresentations were "substantial." Plaintiffs allege that The Chubb Institute's accrediting agency requires 70% job placement overall, and that admissions representatives would orally convey to students that the school's numbers were 85% to 90%. ¶ 54. What is missing is any allegation as to what the school's real numbers were.  Without such an allegation, there is no way to determine if The Chubb Institute's placement rate was sufficient to meet the requirements of ACCSCT.  Absent that, it can hardly be alleged that the misrepresentation was "substantial" enough to warrant the institution of a proceeding under 34 C.F.R. § 668.71.

Nor can plaintiffs contend that 34 C.F.R. § 668.71 provides the basis for an implied certification.  This regulation does not "*expressly* state[] the provider must comply in order to be paid" or "that payment of the federal funds was in some way conditioned on compliance with those regulations." *Rodriguez* at

304. Yet, this is exactly what even the most expansive version
of the implied certification theory requires.

The analysis is the same with respect to the alleged
misrepresentations to ACCSCT.  Plaintiffs do not allege what the
correct rates were; whether they were above or below the ACCSCT
guidelines; or what, if any, effect the "correct" rates would
have had on ACCSCT's determination whether to seek to revoke
Chubb's accreditation.  The FCA does not convert the federal
courts into enforcers of accrediting agency rules.

B.   Admissions Criteria

The second category of misrepresentations upon which
plaintiffs rely relates to admissions criteria.  Significantly,
these allegations involve only misrepresentations made **to
students**.[22]  In paragraph 24(ii), it is alleged that "Chubb
misrepresented to the students whether they met Chubb's own
admission criteria and/or whether the students could benefit
from the education or training offered…Chubb made these

---

[22] Defendants note that the heading in the SAC relating to
admissions criteria (between ¶ 59 and ¶ 60) is entitled "Chubb
Made Misrepresentations to Prospective Students, the ACCSCT and
ACCET and the Department of Education about its Admissions
Criteria."  The problem is that none of the subsequent
paragraphs include any allegation that Chubb made a
misrepresentation to the ACCSCT, ACCET or the Department of
Education.  Indeed, although the plaintiffs mention ACCET, they
make no allegation anywhere in the SAC that defendants had a
relationship with ACCET.  Moreover, in paragraph 24 (iv),
plaintiffs only allege that Chubb made misrepresentations "to
the students."

misrepresentations to the students, in violation of ACCSCT standards of accreditation." No instance of any such wrongful conduct is alleged. There are no certifications or assurances to ACCSCT that are identified. Such certifications are essential to the false certification theory of the False Claims Act. Absent this element, the SAC fails to state a claim upon which relief may be granted.

C.   Satisfactory Academic Progress

Plaintiffs cite to 20 U.S.C. §§ 1087d, 1090, 1094, and 34 C.F.R. § 668.32 in support of the allegations relating to misrepresentations that students were making satisfactory academic progress. Plaintiffs allege that Chubb made misrepresentations to students, the accreditation agencies and the federal government with false certifications that the students were making satisfactory academic progress toward completing their program of study.[23]  ¶ 24(iii).

As with all of the allegations of wrongful conduct in the SAC, these allegations fail to identify any particulars of the misrepresentations. Rule 9(b) requires that plaintiffs support their allegations with the "who, what, when, where and how" of

---

[23] In this section, plaintiffs continue their pattern of inconsistent pleading. As noted, paragraph 24(iii) alleges misrepresentations to students, accreditation agencies and the federal government. In the heading on this issue (between ¶ 67 and ¶ 68), plaintiffs claim that Chubb "misrepresented to students and the Department of Education." The allegations that follow do not mention accreditation agencies.

the events.  *In re Rockefeller Ctr. Props. Secs. Litig.*, 311

F.3d 198, 217 (3d Cir. 2002).  *See In re Burlington Coat Factory*

*Securities Litigation*, 114 F.3d 1410, 1417-18 (3d Cir. 1997).

In the SAC no particulars are furnished.  No student is

identified, no teacher is named, and no dates of the events are

provided.  Without the "who, what, where, when and how," the SAC

must be dismissed.

Not only would plaintiffs use the FCA to convert the courts

into a super administrative enforcement agency, they would

invoke its super enforcement process on the basis of conclusory

allegations completely devoid of any specificity.

D.    Student Eligibility

Plaintiffs' claims based on the alleged ineligibility of

its students to receive Title IV assistance are redundant to the

extent that they are based on satisfactory academic progress.

*See* ¶¶ 24(iii), 68-72.  To the extent that the claims rest on

other eligibility criteria, it is difficult to discern the

nature of plaintiffs' complaint.  In paragraph 24(v), they

allege that "Chubb's management also made 'professional

judgments' admitting and allowing students that were ineligible

for Title IV/HEA program assistance to apply for Title IV/HEA

programs even though they were illegal non-citizens, did not

have a valid social security number, did not comply with the

U.S. Selective Service registration requirements and/or did not

have a high school diploma or G.E.D." Significantly, plaintiffs do not allege in this paragraph that the students who were ineligible for these reasons actually **obtained** Title IV funds, only that Chubb's management **allowed them to apply**. There is also no allegation that anyone who applied falsely represented their status. As with the rest of the SAC, there is no allegation of any specific wrongful act. Thus, the SAC lacks the particularity required to invoke the machinery of the FCA.

     E.   Incentive Compensation

According to plaintiffs, when an educational institution enters into the PPA, it "certifies" that "it will not provide…any commission, bonus or other incentive payment based directly or indirectly on success in securing enrollments." ¶ 76. Plaintiffs cite to the PPA, the HEA (§ 487(a)(2)), and the federal regulations (34 C.F.R. § 668.14(b)(22) as the source of the quoted language. The PPA is a forward looking contract. To state a claim under the promissory fraud theory of False Claims Act liability, plaintiffs must allege that Chubb had no intention of complying with the PPA requirement when it signed it. The SAC contains no such allegation.

Nor is compliance with the incentive compensation provision a gating item for payment of a student financial aid claim. Like all the other requirements of the regulations and the PPA, Department of Education officials may initiate a variety of

proceedings if they wish to seek redress for a perceived
violation.  See 34 C.F.R. Subparts G and H.  Termination of
eligibility is only one of the sanctions that may be sought.

    Plaintiffs' incentive compensation allegation conveniently
ignores the safe harbor language of § 668.14(b)(22) that
identifies "activities and arrangements that an institution may
carry out **without** violating the provisions" of the paragraph
that they cite.  That part of the regulation includes a list of
activities that are permissible.  One incentive-based
arrangement that is permissible is:

> The payment of fixed compensation, such as a fixed annual
> salary or a fixed hourly wage, as long as that compensation is
> not adjusted up or down more than twice during any twelve month
> period, and any adjustment is not based *solely* on the number of
> students recruited, admitted, enrolled, or awarded financial
> aid.

34 C.F.R. § 668.14(b)(22)(ii)(A).

    Plaintiffs' allegations in ¶¶ 73, 74, and 75 ignore this
provision.  They allege that salary schedules and "compensation
adjustment scales" are "based **directly** upon enrollment
activities."  (Emphasis added).  They do not allege that
compensation is based **solely** on those activities.  Therefore,
even if the SAC were found to adequately allege either the false
certification theory or the promissory fraud theory, it would
fail to allege a cause of action because plaintiffs must allege
that the compensation system is based **solely** on enrollment

activities in order to properly allege that the defendants have made a false certification of compliance with the law. Similarly, such allegations would need to be alleged with particularity.  *See Bott* at 811 ("Relators have not pled specific facts supporting the inference that salary reviews were performed solely on the basis of recruiting activities."). Absent such an allegation, the SAC fails to state a claim.

The failure of the SAC to make these allegations is not surprising.  In the very documents that plaintiffs have incorporated into the SAC when they amended it[24], it is clear that defendants' compensation plan complies with the safe harbor.  For example, an "Admission Compensation Plan 2004" provides that compensation for admissions representatives is based on five main categories:  monthly starts, retention, individual effort, administration, and professionalism. Components of these categories include factors such as "100% of student files complete and accurate," "C2K data entry complete," "100% adherence to dress code," and "ability to effectively interact with other staff."  See Exhibit 27 to Exhibit F, Part 20.  Thus, this plan utilizes factors other the number of students recruited, admitted, enrolled, or awarded financial aid in determining compensation and is in compliance with the regulation.

─────────────

[24] Exhibit F, Part 20 to SAC.

The allegations of the SAC regarding the incentive compensation plan also fail to satisfy the requirements of the false certification and promissory fraud theories.  The incentive compensation restrictions are an explicit condition of the PPA that is imposed by statute (20 U.S.C. § 1094(a)(20)) and regulation (34 C.F.R. § 668.14(b)(22)).  Alleged violations of the regulations have been the basis of several *qui tam* actions under both the false certification and the promissory fraud theories. The analysis of the court in those cases is helpful in understanding why the incentive compensation plan does not support a FCA case.

In *Graves,* plaintiffs alleged that ITT falsely promised that it would comply and certified that ITT had complied with the regulation prohibiting participating educational institutions "from making commission or incentive payments to admissions or recruitment personnel based on success in securing enrollments or financial aid for students."  *Graves* at 489. They claimed "that because ITT received student financial aid funds while ITT was 'in violation of the incentive compensation prohibition' of Title IV…ITT 'knowingly presented, or caused to be presented, false or fraudulent claims for payment or approval,' in violation of 31 U.S.C. §§ 3729(a)(1), (a)(2), and

(a)(7)."  This is, in essence, the same claim made by plaintiffs in this case.[25]

   With respect to the allegations of false certification, the court in *Graves* noted that liability for false certification is premised on compliance with the regulation being a "prerequisite to government payment."

   The violation of the statute or regulation does not create a cause of action under the False Claims Act; liability arises only if the defendant has made a false certification or compliance with the statute or regulation, when payment is conditioned on that certification.

*Graves* at 497.

   The court then undertook an extensive examination of the language of the PPA, noting that the PPA's language regarding incentive compensation is a verbatim recitation of the statutory language in 20 U.S.C. § 1094(a)(20).  The court found that

   Nothing in the PPA required ITT expressly to certify compliance with the provision prohibiting incentive payments. In the PPAs, ITT agreed to comply in the future with the statutes and regulations governing the student financial assistance programs.  However, the PPA did not require ITT to certify compliance with the incentive compensation prohibition.

*Graves* at 500.

   The court referenced the decision of the Second Circuit in *Mikes*, and adopted the distinction between "generally certifying compliance with applicable regulations and statutes governing **participation** in a program, as opposed to certifying compliance

---

[25] Plaintiffs in this case do not make any claim under (a)(7).

with a particular requirement that is a **prerequisite to receiving or retaining payment** under that program." *Graves* at 501 (emphasis added).  The court concluded that the PPA "does not certify compliance with the regulation governing incentive compensation."  As a result, it found that the complaint did not state a cause of action under the false certification theory of the False Claims Act.

As the same PPA is the basis for the plaintiffs' allegations in this case, the analysis of the court in *Graves* mandates a similar conclusion, i.e. that the PPA does not support a claim under the false certification theory of the False Claims Act.

The court then proceeded to evaluate the allegations of the complaint under the promissory fraud theory.[26]  In order to establish liability under this theory, plaintiffs must allege facts that show that when the school entered into the PPA, it had no intention of complying with the provision on incentive compensation.  Establishing such intent requires significantly more than mere nonperformance.  The court in *Graves* concluded that plaintiffs had failed to allege facts to show that the defendant had fraudulently induced the government to permit it to receive Title IV funds.  *Graves* at 503-04.  *See Main* at 917

---

[26] As noted previously, the *Graves* court utilized the term "fraud in the inducement."

(promissory fraud theory limited to circumstances where plaintiff alleges "that the University not only knew, when it signed the phase-one application [i.e. the PPA], that contingent fees to recruiters are forbidden, but also planned to continue paying those fees while keeping the Department of Education in the dark."); *Gay* (plaintiffs failed to allege that Lincoln had made a false certification of compliance either express or implied as a condition of payment, or that Lincoln had no intention of complying with the incentive compensation ban when it entered into the PPA).

As plaintiffs in this case allege no facts at all to support an intent to violate the incentive compensation ban at the time Chubb signed the PPA, the SAC fails to state a claim of relief and, like the complaint in *Graves*, must be dismissed.

## V.  THE SECOND AMENDED COMPLAINT FAILS TO ALLEGE A CONSPIRACY TO VIOLATE THE FALSE CLAIMS ACT

The SAC identifies four defendants:  The Chubb Institute, The Chubb Corporation, Chubb America Service Corporation, and High-Tech Institute.  These are the only possible conspirators who could have "conspired to defraud the United States government in violation of 31 U.S.C. § 3729(a)(3)." (¶ 96.)

The law is well settled that "a parent corporation and its wholly owned subsidiaries are legally incapable of forming a conspiracy with one another."  *Fogie v. Thorn Americas, Inc.*,

190 F.3d 889, 898 (8th Cir. 1999).  *See Ideal Dairy Farms, Inc.*
*v. John Labatt, LTD.*, 90 F.3d 737, 750 (3d Cir. 1996); *Platten*
*v. HG Bermuda Exempted Limited*, 437 F.3d 118, 131 (1st Cir.
2006).

Prior to 2004, The Chubb Institute is alleged to have been
a subsidiary of The Chubb Corporation.[27]  ¶ 6.  These two were
part of the same corporate family and therefore could not
conspire with one another.  High-Tech Institute allegedly
purchased The Chubb Institute in either September 2004 (¶ 6) or
January 2004 (¶7).  At that point, they were part of the same
corporate family and therefore could not conspire with one
another.  Since there are no allegations whatsoever to support
the notion that High-Tech Institute conspired with The Chubb
Institute **prior** to its purchase of The Chubb Institute, the
conspiracy claim must be dismissed.[28]

**VI.   THERE ARE NO FACTUAL ALLEGATIONS THAT HIGH-TECH INSTITUTE
PERFORMED ANY ACT AT ALL TO SUPPORT THE IMPOSITION OF
LIABILITY AGAINST IT UNDER ANY THEORY OF THE CASE.**

---

[27] No explanation is offered of the relationship of Chubb America
Service Corporation to either The Chubb Institute or The Chubb
Corporation.

[28] The only possible non-family corporate relationships that could
exist (and therefore support an alleged conspiracy) are between
High-Tech Institute and The Chubb Corporation or between High-
Tech Institute and Chubb America Service Corporation.  There are
no allegations that remotely suggest that High-Tech Institute
conspired with either The Chubb Corporation or Chubb America
Service Corporation.

The FAC contained only two references to High-Tech Institute. In paragraph 7, plaintiffs alleged that

Defendant High-Tech Institute, Inc. (hereinafter "HTI") is a family of schools offering Associate's and Bachelor's degrees and technical training. HTI purchased The Chubb Institute in and around January 2004. HTI's principal place of business is 1515 E. Indian School Road, Phoenix, Arizona 85014. Its website is .

In paragraph 24, they alleged that

In 2004, The Chubb Institute was acquired by High-Tech Institute (HTI), which added the Chubb Institute's eight locations to its list of 17 HTI campuses throughout the United States.

As a result, defendant High-Tech Institute moved to dismiss the FAC as to it, noting that the plaintiffs made no attempt whatsoever to justify naming High-Tech Institute as a defendant. High-Tech Institute noted in particular that the FAC contains no allegations to suggest that plaintiffs have included High-Tech Institute as a defendant on the theory that it is the alter ego of The Chubb Institute and that the corporate veil should be pierced.

In response, plaintiffs have added two factual references to High-Tech and two legal claims in the SAC. Neither the references nor the claims are sufficient to justify the filing of a lawsuit against High-Tech.

In fact, the two factual references are simply not supported by the documents submitted by plaintiffs themselves. The first factual allegation against High-Tech is in paragraph

24(i)(b) of the SAC.  Plaintiffs cite to a July 9, 2004 letter
from Kevin L. Kirley, Executive Director of The Chubb Institute,
to ACCSCT, and allege that the letter was submitted "knowing
that the ACCSCT would rely on these documents and grant The
Chubb Institute **and The High Tech Institute** accreditation.  The
Chubb Institute and The High Tech Institute submitted these
documents…".  (Emphasis added).  On the contrary, the letter
clearly indicates that it was submitted by The Chubb Institute,
for its Jersey City campus, not High Tech Institute Inc.  It was
The Chubb Institute that was accredited by ACCSCT, not its
parent corporation. The misrepresentation by plaintiffs is
repeated in paragraph 24(i)(f) where they allege that The Chubb
Institute and The High Tech Institute submitted the above
referenced false documents.  Those allegations are not supported
by the documents relied upon.

Plaintiffs' attempt to plead a claim against High Tech
Institute under an alter ego (Fifth Claim of the SAC) or
successor liability (Sixth Claim of the SAC) theory is also
fatally flawed.  Interestingly, the bases alleged in support of
both claims are identical, i.e. High Tech exclusively controlled
Chubb Institute, Chubb Institute was managed [sic] and reported
to High Tech, all moneys paid by the government to Chubb
Institute directly benefitted High Tech, High Tech used Chubb
Institute as an alter ego, High Tech was aware of and had

complete control of the fraud committed by Chubb Institute, and High Tech created this corporate structure to avoid its duties to consumers and shelter its wrongdoings from judicial oversight.  SAC ¶¶ 106-119.

The successor liability claim completely misapprehends the doctrine.  Plaintiff alleges that High Tech is liable **as the successor to The Chubb Institute** (¶ 119).  The problem is that High Tech is not the successor to The Chubb Institute.  It is the successor to Chubb Corporation, the seller of The Chubb Institute.[29]  Indeed, the essence of successor liability is to impose the liability of a company that sold an asset on the company that purchased the asset.  *See Premier Pork, LLC v. Westin, Inc.*, 2008 WL 724352, at *4 (D.N.J. Mar. 17, 2008)(Exhibit 6, attached hereto).  Since there are no allegations that High Tech is liable for the wrongs committed by Chubb Corporation, the SAC fails to plead a cause of action for successor liability.

Moreover, the SAC makes no more than a token attempt to pierce the corporate veil. A claim that seeks to pierce the corporate veil is a state law claim.  *Sonnenblick-Goldman C. v. ITT Corp. et al.*, 912 F.Supp. 85, 88 (S.D.N.Y. 1996).  In this case, it makes no difference if the controlling law is that of

---

[29] High Tech Institute actually purchased all of the outstanding shares of stock of The Chubb Institute from Chubb Computer Services, Inc. in a stock purchase transaction.

New Jersey or of Arizona, where High Tech Institute is incorporated. Arizona law provides in order to pierce the corporate veil between a parent company and its subsidiary, the "plaintiff must prove both (1) unity of control and (2) observance of corporate form would sanction a fraud or promote injustice." *Deutsche Credit Corporation v. Case Power & Equipment Company*, 876 P.2d 1190, 1195 (Ariz. 1994); *Gatecliff v. Great Republic Life Insurance Co.*, 821 P.2d 725 (Ariz. 1991). New Jersey law utilizes the same principles. *Craig v. Lake Asbestos of Quebec, Ltd.,* 843 F.2d 145, 149 (3d Cir. 1988). Factors used to determine whether to pierce the corporate veil include:  gross undercapitalization, failure to observe corporate formalities, non-payment of dividends, siphoning of funds of the corporation by the dominant shareholder, non-functioning of other officers and directors, and absence of corporate records.  *See Board of Trustees of Teamsters Local 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 172 (3d Cir. 2002)("*Foodtown*").

Most significantly, the complaint must support the allegations with more than conclusory allegations.  Absent such allegations, the complaint fails to state a cause of action and must be dismissed.  *See Ohai v. Verizon Communications, Inc.*, No. 05-729, (D.N.J. Oct. 24, 2005)(slip opinion attached hereto as Exhibit 7).  While the *Ohai* court noted that it is unclear

whether the specificity requirement of Fed.R.Civ.P. 9(b) applies to allegations of abuse of the corporate form, it found the complaint did not give "the Court any reason, by way of allegation or otherwise, to ignore" the principle that a corporation is a separate entity from its shareholders.   The court noted in particular the lack of any showing of corporate "dominance" by the parent corporation as well as any allegations to suggest that it was really the parent, acting through the subsidiary, that committed the offensive conduct.

Like the complaint in *Ohai,* the SAC is utterly devoid of any factual allegations to support any of the relevant factors. Plaintiffs simply allege that High Tech Institute "exclusively controlled The Chubb Institute," that High Tech Institute used The Chubb Institute as an alter ego, and that High Tech Institute was aware of and had complete control of the fraud committed by The Chubb Institute.   The failure to include any facts to support the claim of dominance is fatal to the claim.

**VII.  TO THE EXTENT THAT THE SECOND AMENDED COMPLAINT SEEKS DAMAGES BASED ON GOVERNMENT-INSURED LOANS, IT FAILS TO STATE A CAUSE OF ACTION.**

The funds identified by plaintiffs as the source of the "claims" against the government fall into three basic categories:  Pell Grants, government-insured loans, and interest on government insured loans.  Pell Grants involve funds requested directly from the United States government.  (¶ 39).

As such, a request for Pell Grant funds constitutes a claim against the government.  Similarly, the United States government pays the interest on government-insured loans while students are attending school and during authorized grace periods.  (¶ 41).  Therefore, a request for payment of interest constitutes a claim against the government.

Government-insured loans, however, are fundamentally different for purposes of determining whether a request for a government-insured loan is a claim against the government.  As the plaintiffs allege, requests for government-insured loans do not go to the government, but instead are submitted to a private lender.  (¶ 40).  Therefore, the funds obtained are not government funds.  The government only pays money if a student defaults on the loan and if the guarantee agency cannot collect from the student.  It is only then that the Department of Education makes a payment.

For purposes of the False Claims Act, a request for a government-insured loan has been held not to constitute a claim unless and until the government is forced to make good on the guarantee of the loan.  "[A] claim under the False Claims Act only occurs when the borrower defaults and the government must make payment." *See United States v. Rivera*, 55 F.3d 703, 710 (1st Cir. 1995); *Graves at* 495-96; *Gay* at 2003 WL 22474586, at

*2; *United States v. Vanoosterhout*, 898 F.Supp. 25, 29 (D.D.C. 1995).

The court in *Gay* found that the complaint was insufficient because it only contained general and conclusory allegations that the defendant submitted claims for student financial aid under Title IV. "Rather than describing any specific request or demand by Lincoln on the government for money, Relators provide only a generic description of Lincoln's program procedures in HEA student loan programs." *Gay* at 2003 WL 22474586, at *2.

A review of the allegations of the SAC in this case reveals a similarly general and conclusory description of Chubb's financial aid process. *See* ¶¶ 38 to 40. No attempt is made to tie any of the alleged misrepresentations to any particular student. Therefore, it is impossible to determine whether a student who was not making satisfactory academic progress received a grant. As in *Gay*, these allegations are insufficient to state a cause of action under the False Claims Act.

## IX. CONCLUSION

For all of the foregoing reasons, the SAC fails to allege fraud with the particularity required by Rule 9(b) and fails to state a claim for relief as required by Rule 12(b)(6) of the Federal Rules of Civil Procedure. Therefore, it must be dismissed.

Respectfully submitted,


/s_____
Thomas J. Hylden
Larry S. Gondelman
Powers Pyles Sutter & Verville, PC
1501 M Street, NW - Seventh Floor
Washington, D.C. 20005
Tel: (202) 466-6550

/s_____
Eric A. Savage
Littler Mendelson, PC
One Newark Center - Eighth Floor
Newark, New Jersey  07102
Tel: (973) 848-4700

Attorneys for Defendants
   The Chubb Institute and
   High-Tech Institute, Inc.