NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

————————————————————— )
UNITED STATES OF AMERICA, *ex rel.* )
MARY BETH PILECKI-SIMKO and )
TOM GIUNTA, )                                    Hon. Garrett E. Brown, Jr.
)
        Relators, )                         Civil Action No. 06-3562
)
        v. )                               **<u>MEMORANDUM OPINION</u>**
)
THE CHUBB INSTITUTE, THE CHUBB )
CORPORATION, CHUBB AMERICA )
SERVICE CORPORATION, and )
HIGH-TECH INSTITUTE, INC. )
)
        Defendants. )
————————————————————— )

Michael S. Green, Esq.
GREEN & PAGANO, LLP
522 Route 18, P.O. Box 428
East Brunswick, New Jersey 08816

Gary S. Graifman, Esq.
KANTROWITZ, GOLDHAMER & GRAIFMAN
210 Summit Avenue
Montvale, New Jersey 07645
*Attorneys for Plaintiffs/Relators*

Eric A. Savage, Esq.
LITTLER MENDELSON, PC
One Newark Center, Eighth Floor
Newark, New Jersey 07102-5311
*Attorneys for Defendants The Chubb Institute & High-Tech Institute, Inc.*

Michael R. McDonald, Esq.
GIBBONS, PC
One Gateway Center
Newark, New Jersey 07102-5310
*Attorneys for Defendant The Chubb Corporation*

**BROWN, Chief Judge:**

This matter is a *qui tam* action[1] brought pursuant to the False Claims Act, 31 U.S.C.

§ 3729 et seq., by Relators Mary Beth Pilecki-Simko and Tom Giunta against their former

employer, The Chubb Institute (TCI).  Relators allege that TCI knowingly caused false claims to

be filed by making a number of misrepresentations to the Department of Education, its

accrediting agencies, and students that wrongfully enabled them to secure student financial aid in

the form of loans and grants from the federal government.  Relators also seek to impose liability

for this conduct on TCI's former corporate parents, High-Tech Institute (HTI) and The Chubb

Corporation, on the basis of their alleged control of TCI's actions.

Presently before the Court are two motions (Doc. Nos. 38, 39) to dismiss Relators'

Second Amended Complaint filed by Defendants The Chubb Corporation, TCI, and HTI.[2]  Both

motions seek dismissal pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6) on the

grounds that Relators have failed to plead fraud with the requisite particularity and failed to state

a claim upon which relief can be granted.  HTI and The Chubb Corporation also challenge the

sufficiency of the allegations supporting Relators' veil-piercing and successor liability claims

against them.  For the following reasons, the Court will grant The Chubb Corporation's motion,

---

[1]"*Qui tam* actions have a long history and were used in England before the foundation of this country."  *United States ex rel. Atkinson v. Pa. Shipbuilding Co.*, 473 F.3d 506, 509 (3d Cir. 2007).  The term "*qui tam*" derives from "the Latin phrase *qui tam pro domino rege quam pro se ipso in hac parte sequitur*, which means 'who pursues this action on our Lord the King's behalf as well as his own.'"  *Vt. Agency of Natural Res. v. United States ex rel. Stevens*, 529 U.S. 765, 769 n.1 (2000) (citation omitted).  "Under modern practice, *qui tam* actions are brought by private plaintiffs on behalf of the Government in exchange for some portion of any resulting damages award."  *United States ex rel. Rodriguez v. Our Lady of Lourdes Med. Ctr.*, 552 F.3d 297, 299 n.1 (3d Cir. 2009) (citing *Vt. Agency of Natural Res.*, 529 U.S. at 773–74).

[2]This matter was reassigned to the undersigned by Order of August 10, 2009.

and the Court will grant the motion filed by TCI and HTI.

I.      PROCEDURAL HISTORY

The present motions challenge the sufficiency of Relators' Second Amended Complaint (SAC). Defendants had previously filed motions challenging the sufficiency of Relators' First Amended Complaint,[3] but this Court denied those motions without prejudice on August 24, 2009, because Relators sought leave to amend their pleadings a second time. Defendants and the Court consented to Relators' request,[4] and Relators filed a six-count SAC on September 21, 2009.

Defendants renewed their motions to dismiss on October 16, 2009, and the Government reinstated the Statement of Interest it filed with regard to Defendants' earlier motions to dismiss. (Doc. No. 43.)[5]  These motions are now ripe for the Court's consideration.

II.     THE SECOND AMENDED COMPLAINT

For purposes of these motions, this Court must accept as true the factual allegations contained in the SAC and draw all reasonable inferences in favor of Relators. *See, e.g.*, *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009). According to the SAC, as of the time of the Complaint,

---

[3]The Court notes that the docket in this case reflects that Relators' did not properly file the First Amended Complaint on the Court's CM/ECF system. In lieu of this filing, The Chubb Corporation has provided a copy of the First Amended Complaint (McDonald Decl., Ex. B), which Relators do not dispute.

[4]Defendants' stipulation of consent is reflected by Magistrate Judge Esther Salas' Consent Order of September 22, 2009.

[5]The Government had previously declined to intervene in this case on August 19, 2008. (Doc. No. 5.)

TCI[6] was a technical career training institute that had been a part of the HTI family of technical career training schools since HTI purchased the Institute in 2004. Prior to that time, TCI had been a subsidiary of insurance company The Chubb Corporation. Relators worked as career services and admissions counselors, respectively, for the North Brunswick Campus of TCI for different periods between 1995 and 2005. (SAC ¶¶ 5–7.)

According to Relators, TCI participates in the federal student financial aid program authorized by Title IV of the Higher Education Act, which provides financial assistance in the form of direct loans and federally insured private loans to eligible students that attend qualifying higher education institutions. In order to qualify for federal subsidies, the institution must enter into a Program Participation Agreement (PPA) with the Department of Education, which requires continuing adherence to a number of statutory and regulatory conditions. (*See id.* ¶¶ 9–23.) This process has been referred to by courts as the "phase I application." Students at qualifying higher education institutions then submit individual applications for financial aid, which courts have referred to as "phase II applications."

The Court understands Relators to contend that TCI violated the False Claims Act by knowingly violating Title IV requirements it had agreed to in the phase I application (the PPA)

---

[6]The Court notes that the SAC purports to use "Chubb Institute" and/or "Chubb" to refer to TCI, The Chubb Corporation, and Chubb America Service Corporation (SAC ¶ 6); yet, the SAC consistently differentiates between TCI and its alleged parent corporations bearing the "Chubb" name. Furthermore, in their opposition papers, Relators do not contend that The Chubb Corporation or Chubb America Service Corporation directly violated the False Claims Act. Thus, rather than reading every allegation about "Chubb" as a group allegation against all three Chubb Defendants, which would be inconsistent with Relators' representations to the Court, the Court construes the SAC's "Chubb" and "Chubb Institute" allegations to refer to TCI unless the SAC specifies that allegation concerns The Chubb Corporation or Chubb America Service Corporation.

and knowingly providing false statements to maintain Title IV eligibility, but nevertheless continuing to submit students' phase II applications for financial aid as if it had complied with the regulations.  (*See id.* ¶¶ 24, 51–86.)  Courts have referred to this theory of False Claims Act liability—wherein a party "submit[s] claims for payment to the federal Government while at the same time violating, without disclosing, applicable rules" governing eligibility for the government program—as the implied false certification[7] theory of liability.  *See, e.g.*, *United States ex rel. Rodriguez v. Our Lady of Lourdes Med. Ctr.*, 552 F.3d 297, 303 (3d Cir. 2009).  In other words, by submitting or causing to be submitted the claim for funds, the entity implicitly falsely certifies that it has complied with governing regulations.

With regard to specific violations of Title IV regulations, Relators allege that TCI knowingly made the following misrepresentations to the Department of Education, its accreditation agencies, and students between 2001 and 2006 in order to satisfy various phase I obligations: (1) false reports of the employment placement rates of TCI graduates (SAC ¶¶ 24(i)(a)–(g) and (ii), 52–59); (2) false assurances that TCI students were making satisfactory academic progress in their program of study (*id.* ¶¶ 24(iii), 68–72); (3) permitting English-deficient applicants and applicants who failed admissions tests to enroll despite their failure to meet TCI admissions standards (*id.* ¶¶ 24(iv), 60–67); (4) allowing students ineligible for financial assistance under Title IV to apply for Title IV funds (SAC ¶¶ 24(v), 80–85); and (5) false assurances of compliance with Title IV's ban (hereinafter "incentive compensation ban") on

---

[7]Implied false certification, which refers to a submission for payment without disclosing the knowing failure to comply with applicable regulations, thus differs from an express false certification, which occurs when a participating institution falsely certifies, usually on the claim for payment itself, that it is currently in compliance with the applicable regulations.

the payment of bonuses to recruiters on the basis of the number of students they admit (*id.* ¶¶ 24(vi), 73–79).  Further, Relators allege that TCI employees used "pixie dust" to increase applicants' admission test scores and thereby increase enrollment, that TCI rated admissions personnel with scorecards to award bonuses based on enrollment numbers, and that TCI administrators made "professional judgment[s]" that admissions personnel should submit to the Government the financial aid forms for ineligible students.  (*Id.* at ¶¶ 61, 74–75, 82.)

In support of these allegations, Relators submit numerous exhibits that they contend demonstrate the willfully false statements TCI submitted to its accreditation agencies concerning the job-placement rates of its students.  (SAC Exs. A–E.)  Relator Pilecki-Simko also submitted a sworn affidavit identifying 13 students from TCI's North Brunswick campus that she claims "are examples of the allegations made in the complaint and disclosure statement."  (SAC Ex. F, Pt. 23 ¶ 3.)  These purported "examples" included one graduate discovered to be an illegal alien, two graduates who were not proficient in the English language, two students who gave poor interviews and could not be placed, two students that received assurances from admissions representatives regarding employment and salary opportunities, and six students whose employment TCI ostensibly misrepresented.  (*See id.*)[8]

With regard to TCI's parent corporations, Relators assert that HTI directly participated in TCI's misrepresentations to its accrediting agency about the employment placement rates of TCI

_____

[8]Relator Giunta also submitted a two-paragraph affidavit, consisting solely of vague assertions that he was "fully familiar with this proceeding," and that "[t]he allegations in the complaint and disclosure statement . . . as to the Admission Process and misrepresentations as regards admissions and financial aid are to my knowledge accurate."  (SAC Ex. F, Pt. 24.)  Relator Pilecki-Simko's affidavit contained similar generic assertions.  (*See* SAC Ex. F, Pt. 23 ¶¶ 1–2.)

graduates.  (*See id.* ¶ 24(i)(a), (b).)  Relators further allege that HTI and The Chubb Corporation both (i) knew of TCI's misconduct, and (ii) controlled TCI to the point that TCI was their alter ego.  (*See id.* ¶¶ 99–119.)

As presently constituted, the SAC presents three counts of False Claims Act violations arising under the following subsections[9] of 31 U.S.C. § 3729: (a)(1) (knowingly causing a false claim for payment to be presented to an employee of the United States Government), (a)(2) (knowingly using a false statement to get a false claim paid by the Government), and (a)(3) (conspiracy to defraud the Government by getting a false claim paid).  With regard to TCI's former parent corporations, the SAC alleges one count of piercing the corporate veil against both HTI and The Chubb Corporation, as well as one count of successor liability against HTI.

III.    DISCUSSION

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) may be granted only if, accepting all well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, a court finds that plaintiff has failed to set forth fair notice of what the claim is and the grounds upon which it rests.  *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted).  A complaint will survive a motion to dismiss if it "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 570).

The plausibility standard requires that "the plaintiff plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged"

---

[9]Unless otherwise noted, the Court refers to portions of 31 U.S.C. § 3729 when it refers to "subsections."

and demands "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 129 S. Ct. at 1949 (citing *Twombly*, 550 U.S. at 556).   Although a court must accept as true all factual allegations in a complaint, that tenet is "inapplicable to legal conclusions," and "[a] pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 555); *see also Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008).   In evaluating a motion to dismiss, a court may consider only the complaint, exhibits attached to the complaint, matters of public record, and undisputedly authentic documents if the complainant's claims are based upon those documents.  *Pension Benefit Guar. Corp. v. White Consol. Indus.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

Here, Relators allege that TCI violated the False Claims Act by knowingly violating Title IV requirements it had agreed to in its phase I application (the PPA) and knowingly providing false statements to maintain Title IV eligibility, but nevertheless continuing to submit students' phase II applications for financial aid as if it had complied with the applicable regulations. Alternatively, Relators allege that TCI conspired with its corporate parents to defraud the Government by performing these alleged acts.  Relators further allege that TCI's parent corporations controlled TCI's operations to the point that liability should attach to them for TCI's transgressions.  Presently, Defendants challenge both the legal basis and the sufficiency of the fraud allegations for Relators' False Claims Act claims, as well as the pleadings for Relators' veil-piercing and successor liability claims.  Although the weight of authority appears to support Relators' implied false certification theory of a False Claims Act violation in the context of a university's phase I application for Title IV funds, the Court finds that the allegations contained

in the SAC fall well short of Rule 9(b)'s heightened pleading requirement for allegations of fraud.  The Court further finds Relators' conclusory allegations about TCI's parent corporations insufficient to support veil-piercing and successor liability claims.

### A. False Claims Act

At the time that Relators commenced this lawsuit, the False Claims Act provisions relied on by Relators made it unlawful for any entity to do the following acts:

> (1) knowingly present[ing], or caus[ing] to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;
>
> (2) knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;
>
> (3) conspir[ing] to defraud the Government by getting a false or fraudulent claim allowed or paid . . . .

31 U.S.C.A. § 3729(a)(1)–(3) (West 2003 & Supp. 2008).[10]  For purposes of these subsections,

---

[10]Last year, Congress substantively revised and reorganized the above portion of § 3729(a) into a new § 3729(a)(1), which prohibited the following acts:

> (A) knowingly present[ing], or caus[ing] to be presented, a false or fraudulent claim for payment or approval;
>
> (B) knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement material to a false or fraudulent claim;
>
> (C) conspir[ing] to commit a violation of subparagraph (A), (B), ...

Fraud Enforcement Recovery Act (FERA), Pub. L. No. 111-21, § 4(a)(1), 123 Stat. 1617, 1621 (2009) (codified at 31 U.S.C. § 3729(a)(1)).  Congress provided that, with the exception of new § 3729(a)(1)(B), these revisions to § 3729(a)(1) would only "apply to conduct on or after the date of enactment [May 20, 2009]."  FERA § 4(f)(1).  Thus, it is clear that FERA's revisions to the False Claims Act would not supplant the preexisting subsections (a)(1) and (a)(3) of § 3729 in

the Act defined the scienter requirement "knowingly" to refer to a person who "(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information," but notes that "no proof of specific intent to defraud is required." 31 U.S.C.A. § 3729(b)(1)–(3) (West 2003 & Supp. 2008).

Subsections (a)(1) and (a)(2) share many common elements. As the Third Circuit explained in *United States ex rel. Schmidt v. Zimmer, Inc.*, a prima facie case of a violation under subsection (a)(1) requires a showing that "(1) the defendant presented or caused to be presented to an agent of the United States a claim for payment; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false or fraudulent," but "[i]n order to prove a claim under [subsection] (a)(2), a plaintiff must also show that the defendant made or used (or caused someone else to make or use) a false record in order to cause the false claim to be actually paid or approved." 386 F.3d 235, 242 (3d Cir. 2004) (citations omitted). The Supreme Court clarified in *Allison Engine Co. v. United States ex rel. Sanders* that while a subsection (a)(2) violation does

---

this case. Yet Congress made new § 3729(a)(1)(B) retroactive to "all claims under the False Claims Act . . . that are pending on or after [June 7, 2008]." FERA § 4(f)(1).

Defendants submit that the statutory provision applicable at the time of the filing of the lawsuit should apply, and Relators do not suggest otherwise. This Court is persuaded by Judge Rose's statutory interpretation in *United States ex rel. Sanders v. Allison Engine Co.*, — F. Supp. 2d —, 2009 WL 3626773 at *3–4 (S.D. Ohio 2009) (citing § 3729's definition of "claim," 31 U.S.C. § 3729(b)(2)(A), another FERA retroactivity provision premised on "cases pending on the date of enactment," FERA § 4(f)(2), and the legislative history of FERA), that the "claims pending" trigger to FERA's retroactivity clause refers to *claims* for payment and not *cases* presenting False Claims Act claims. *See also United States v. Aguillon*, 628 F. Supp. 2d 542, 550–51 (D. Del. 2009) (declining to give FERA's revisions retroactive effect). Relators have not alleged that Defendants directly or indirectly made false claims for payment that were pending on or after June 7, 2008. Thus, the Court will not apply FERA's § 3729 provisions retroactively to the legal claims involved in this case.

10

not require subsection (a)(1)'s presentment requirement, an (a)(2) violation requires a showing "that the defendant made a false record or statement for the purpose of getting 'a false or fraudulent claim paid or approved by the Government.'"  128 S. Ct. 2123, 2139 (2008). Meanwhile, a conspiracy in violation of subsection (a)(3) does not require a showing "that the conspirators intended the false record or statement to be presented directly to the Government, but it must be established that they agreed that the false record or statement would have a material effect on the Government's decision to pay the false or fraudulent claim." *Id.* at 2130.

Before the Court addresses Relators' pleadings, the Court will examine the viability of Relators' false certification theory of False Claims Act liability and the applicability of Federal Rule of Civil Procedure 9(b).

### 1. Implied False Certification Theory of Liability

With regard to Relators' false certification theory of False Claims Act liability, it bears mentioning that the Third Circuit has twice declined to adopt this doctrine, but in each instance, it left the door open for this theory of liability in future cases.  *See Rodriguez*, 552 F.3d at 303–04 & n.6 (explaining, on review of a 12(b)(6) dismissal, that the Circuit has not adopted the false certification theory and declining to address the issue, but nevertheless holding that the relators "failed to assert the elements necessary to succeed under that theory"), *abrogated on other grounds by United States ex rel. Eisenstein v. City of N.Y.*, 129 S. Ct. 2230 (2009); *United States ex rel. Quinn v. Omnicare Inc.*, 382 F.3d 432, 441–43 (3d Cir. 2004) (finding, on appeal of an order of summary judgment, that relators' evidence failed to establish a false certification claim under the standards articulated by other courts).

The "archetypal *qui tam* False Claims action" involves "a private company

overcharg[ing] under a government contract, [where] the claim for payment is itself literally false or fraudulent." *United States ex rel. Hendow v. Univ. of Phoenix*, 461 F.3d 1166, 1170 (9th Cir. 2006). Yet the Supreme Court has recognized that Congress "intended [the False Claims Act] to reach all types of fraud, without qualification, that might result in financial loss to the Government." *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968) (citation omitted). Congress reinforced this broad mandate when it passed the 1986 amendments to the False Claims Act, instructing courts that "each and every claim submitted under a contract, loan guarantee, or other agreement which was originally obtained by means of false statements or other corrupt or fraudulent conduct, or in violation of any statute or applicable regulation, constitutes a false claim." S. Rep. No. 99-345, at 9, *reprinted in* 1986 U.S.C.C.A.N. at 5274. Consequently, the overwhelming majority of courts have extended False Claims Act liability to a party's knowingly false certification of compliance with applicable regulations when such regulations are a condition of payment. *See, e.g., United States ex rel. Mikes v. Straus*, 274 F.3d 687, 697 (2d Cir. 2001); *United States ex rel. Siewick v. Jamieson Sci. & Eng'g, Inc.*, 214 F.3d 1372, 1376 (D.C. Cir. 2000); *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 786–87, 793 (4th Cir. 1999); *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 902 (5th Cir. 1997); *United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1266–67 (9th Cir. 1996).

While the extent of the broader implied false certification theory (i.e., where the claim for payment does not include an express certification of compliance) is less clear, both the Seventh and Ninth Circuits have endorsed False Claims Act liability under false certification and/or promissory fraud theory in the context of educational institutions' phase I applications for Title IV eligibility and subsequent receipt of financial aid. *Hendow*, 461 F.3d at 1171–77; *United*

12

*States ex rel. Main v. Oakland City Univ.*, 426 F.3d 914, 916–17 (7th Cir. 2005).[11]  Although these decisions are not binding on this Court, the Court finds their analyses helpful in gauging the extent of false certification liability under the False Claims Act.  The purported false certification in both cases, which also appears in the matter *sub judice*, consisted of the educational institution's false certification on its PPA that it would comply with Title IV's incentive compensation ban.  *Hendow*, 461 F.3d at 1175; *Main*, 426 F.3d at 916.  Placing the purported fraud in terms of the statutory language, the *Main* court explained:

> [t]he University "uses" its phase-one application (and the resulting certification of eligibility) when it makes (or "causes" a student to make) a phase-two application for payment. . . . The phase-two application is itself false because it represents that the student is enrolled in an eligible institution, which isn't true. . . . If a false statement is integral to a causal chain leading to payment, it is irrelevant how the federal bureaucracy has apportioned the statements among layers of paperwork.

*Main*, 426 F.3d at 916.

Defendants ask this Court to employ the Second Circuit's narrow application of the doctrine, which requires that the applicable regulations be an express condition of payment.  *See Mikes*, 274 F.3d at 699–700.  Ostensibly, Defendants worry that broad application of the false certification theory would turn the False Claims Act "into 'a blunt instrument to enforce compliance with all . . . regulations." *See Rodriguez*, 552 F.3d at 304 (quoting *Mikes*, 274 F.3d

---

[11]Although the *Main* court's decision relies on principles of promissory fraud, this Court agrees with the *Hendow* court's observation that promissory fraud and false certification are two sides of the same coin.  *See Hendow*, 461 F.3d at 1174 (explaining that promissory fraud "in substance, is not so different from the false certification theory, and even requires the same elements").  The difference between the two, so far as the Court can discern, is when the institution manifested the scienter to defraud the Government: when it signed the PPA (promissory fraud), or when it purposely caused claims to be filed, knowing that it was violating the PPA (false certification).  *Compare* Main, 426 F.3d at 917 *with Hendow*, 461 F.3d at 1171–72.

13

at 699).  With regard to the Second Circuit's express-condition requirement, the Court notes that

the Third Circuit, while stopping short of adopting the false certification theory, has suggested a

lower threshold would apply, one requiring only "that the alleged violations would be relevant to

'the [G]overnment's disbursement decisions.'"  *Id.* (addressing *dicta* in the Circuit's prior

opinion in *Quinn* that the false certification theory should not be limited to regulations that are

express conditions of payment).  However, even if the express-condition-of-payment rule

applied, the Court does not see how the narrower rule would benefit TCI in this case; federal

statutory and regulatory law, as well as the PPA itself, expressly condition Title IV participation,

and necessarily the receipt of federal funds, on compliance with a number of regulations,

including the incentive compensation ban.  *E.g.*, 20 U.S.C. § 1094(a)(20); 34 C.F.R.

§ 668.14(a)(1), (b)(22)(i); *Hendow*, 461 F.3d at 1176 (rejecting the university's argument that

PPA-incorporated regulations were "merely . . . condition[s] of *participation*, [but] not []

condition[s] of *payment*").  The PPA requirements are "'prerequisites,' and 'the *sine qua non*' of

federal funding, for one basic reason: if the [institution] had not agreed to comply with them, it

would not have gotten paid."  *Hendow*, 461 F.3d at 1176.  As for Defendants' larger concern

about a broad application of the false certification theory, this Court finds solace in the Seventh

Circuit's differentiation between breach of contract and promissory fraud in *Main*:

> The University protests that this approach would treat any violation of
> federal regulations in a funding program as actionable fraud, but that's
> wrong.  A university that accepts federal funds that are contingent on
> following a regulation, which it then violates, has broken a contract.  But
> fraud requires more than breach of promise: fraud entails making a false
> representation, such as a statement that the speaker will do something it
> plans not to do.  Tripping up on a regulatory complexity does not entail a
> knowingly false representation.

426 F.3d at 917 (citation omitted).

### 2. *Federal Rule of Civil Procedure 9(b)*

At the motion to dismiss stage, Relators need not satisfy the above burdens with specific proofs. Yet, because the False Claims Act is a fraud statute, Relators' pleadings must satisfy the heightened pleading requirements of Federal Rule 9(b). *See United States ex rel. LaCorte v. SmithKline Beecham Clinical Labs., Inc.*, 149 F.3d 227, 234 (3d Cir. 1998) (noting that Rule 9(b) "provides sufficient deterrence against overly broad allegations" under the False Claims Act); *see also United States ex rel. Clausen v. Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1309–10 (11th Cir. 2002) (concluding that it was "well settled" and "self-evident" that the False Claims Act was "a fraud statute" triggering application of Rule 9(b)'s heightened pleading requirements). Accordingly, Relators must plead "with particularity the circumstances constituting fraud," but "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

The Third Circuit has held that "Rule 9(b) requires, at a minimum, that plaintiffs support their allegations of . . . fraud with all of the essential factual background that would accompany 'the first paragraph of any newspaper story'—that is, the 'who, what, when, where and how' of the events at issue." *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 217 (3d Cir. 2002) (citations omitted). "Fed. R. Civ. P. 9(b) requires plaintiffs to plead the circumstances of the alleged fraud with particularity to ensure that defendants are placed on notice of the 'precise misconduct with which they are charged, and to safeguard defendants against spurious charges' of fraud." *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 645 (3d Cir. 1989) (quoting *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*, 742 F.2d 786, 791 (3d Cir. 1984).

Although Rule 9(b) permits a plaintiff to generally allege a defendant's mental state, the Third Circuit has read the Rule to still require plaintiffs to "allege facts that show the court their basis for inferring that the defendants acted with 'scienter.'"  *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1418 (3d Cir. 1997).  Although *Burlington Coat Factory* dealt with securities fraud, the Court sees no reason to limit its ruling to that context, especially in light of the Circuit's concern that the False Claims Act not become a "blunt instrument" of regulatory enforcement.  *See Rodriguez*, 552 F.3d at 304; *cf. Quinn*, 382 F.3d at 440 (explaining that False Claims Act relators "cannot 'merely . . . describe a private scheme in detail but then . . . allege simply and without any stated reason for his belief that claims requesting illegal payments must have submitted, were likely submitted or should have been submitted to the Government.") (quoting *United States ex rel. Clausen v. Lab. Corp. of Am.*, 290 F.3d 1301, 1311 (11th Cir. 2002)).[12]

### 3.  Application

While the Court agrees that the weight of authority supports Relators' implied false certification theory of liability in the Title IV context under the False Claims Act, the Court finds that Relators' allegations lack sufficient particularity to satisfy Rule 9(b).

Although Relators present five species of misrepresentation that they contend demonstrate TCI's knowing false certification of compliance with PPA requirements, Relators do not allege any facts identifying either a particular false claim submitted to a Government agent,

---

[12]The Court notes that the Seventh Circuit has endorsed a similar pleading requirement—that the plaintiff "must be able to point to specific, objective manifestations of fraudulent intent"—in the analogous context of promissory fraud claims.  *Bower v. Jones*, 978 F.2d 1004, 1012 (7th Cir. 1992) (quoting *Hollymatic Corp. v. Holly Sys., Inc.*, 620 F. Supp. 1366, 1369 (N.D. Ill. 1985)).

per § 3729(a)(1), or a false statement used to get a false claim paid in violation of § 3729(a)(2).

To recap, Relators allege that TCI made the following misrepresentations to its accreditation

agency, the Department of Education, and/or its students, in violation of PPA regulations: (a)

false reports of TCI graduates' employment placement rates; (b) false assurances that TCI

students were making satisfactory academic progress in their program of study; (c) permitting

English-deficient applicants and applicants who failed admissions tests to enroll despite their

failure to meet TCI admissions standards; (d) allowing students ineligible for financial assistance

under Title IV to apply for Title IV funds; and (e) false assurances of compliance with Title IV's

incentive compensation ban.  Relators also allege (f) that TCI and its parent corporations

conspired to commit the above violations.  The Court considers each subset of allegations in turn.

*a.  Misrepresentations Regarding Employment Placement*

With regard to the alleged false reports of employment placement rates, Relators attached

numerous documents to the SAC that they contend TCI submitted to its accreditation agency

between 2003 and 2005.  (*See* SAC ¶ 24(i) Exs. A ("Completion and Placement Charts"), B

("Letter of Assurance" and "[TCI] Jersey City Campus Interim Report, July 2004"), C ("2003

ACCSCT Annual Report for [TCI] North Brunswick Campus"), D ("2005 Annual Institutional

Report for the Year [2004–2005]"), and E ("Probation Officer Response").)  Relators claim that

these documents contained willfully false statements "with the purpose of falsely obtaining

accreditation" and Title IV eligibility.  *See generally* SAC ¶ 24(i).  Yet Relators' pleadings do not

provide a plausible basis for making this conclusion, and the purported false statements are not

apparent on the face of the documents.  Among the voluminous statistics presented by these

documents, Relators' pleadings do not identify which statements regarding the placement rates

17

were false (or conversely what the actual placement rates were), to what degree they were inflated or diminished, and upon whose instructions they were falsified.  In other words, Relators only provide the *what*, but omit the *who*, *when*, and *how*.[13]

Also missing from Relators' conclusory allegations is the *why*; Relators do not allege circumstantial facts indicating that TCI knowingly committed acts in violation of § 3729.  *See* 31 U.S.C. § 3729(b) (defining "knowing" to require, at a minimum, "reckless disregard of the truth or falsity of the information"); *Allison Engine*, 128 S. Ct. at 2128 (explaining that "a person must have the purpose of getting a false or fraudulent claim 'paid or approved by the Government' in order to be liable under § 3729(a)(2)").  Conspicuously absent from the SAC is any indication, other than Relators' *ipse dixit*, that TCI had notice that its submissions contained erroneous data, let alone that they intended to use erroneous data for the purpose of defrauding the Government.  *Cf. Hendow*, 461 F.3d at 1175 (noting that relators had alleged specific instances of improper bonuses, in addition to allegations that the university adopted policies of violating the incentive compensation ban, that it repeatedly changed these policies to avoid detection, and that its staff  "openly bragged about perpetrating fraud").  The SAC does not provide a plausible basis for inferring that TCI acted with scienter with regard to providing false employment placement reports.  *See Burlington Coat Factory*, 114 F.3d at 1418.

---

[13]The "examples" contained in Relator Pilecki-Simko's Affidavit do not fill in these gaps. Although Relator indicates that as many as six graduates' employment placements were incorrectly entered into TCI's student-placement database, it is unclear who made these entries (i.e., did the Relators make these entries?), why these entries were made, and how they were used.  The SAC does not allege that this data was in any way improperly used by TCI to procure federal funds, and the SAC fails to allege circumstantial facts permitting the inference that these entries were knowingly entered into the database with the purpose of obtaining federal funds not otherwise due.

*b. False Certifications of Satisfactory Progress*

Turning next to Relators' allegations that TCI gave false assurances of students' satisfactory progress in their program of study, the SAC again provides the *what*, but omits the *who*, *where*, *when*, *why*, and *how*.  Relators aver that failing students received passing grades so that they would be eligible for Title IV financial aid, that teachers gave open-book exams with the answers included in the exam, and that "teachers were pressured by management to change the grade curving of classes such that more students would pass . . . [and consequently Chubb] would be allowed under federal and state guidelines to receive more of the tuition monies paid by students."  (SAC ¶¶ 69–71.)[14]  Relators provide no examples of this alleged misconduct (i.e., specific student grades changed, specific teacher pressured to change grading practices), and again they fail to aver circumstantial facts enabling the inference that TCI acted with scienter with regard to providing false progress reports.  *See Burlington Coat Factory*, 114 F.3d at 1418.

*c. Admitting Sub-Standard Students Contrary to TCI Guidelines*

Relators' allegations that TCI knowingly admitted unqualified students who failed TCI's Entrance Assessment Test or lacked English proficiency also lack particularity.  Relators provide no examples of admissions counselors being instructed to apply "pixie dust" to the admissions exams, nor do they provide examples of students benefitting from this practice.  (*See generally* SAC ¶¶ 60–63.)  Although Relator's Affidavit identifies two students whom she claims were not proficient in the English language, the SAC does not explain how their admission violated TCI's PPA requirements.  Further, the SAC again fails to aver circumstantial facts enabling the

---

[14]It is unclear from the SAC whether this alleged misconduct violated Title IV requirements, accreditation requirements, or TCI's own guidelines.

inference that TCI acted with scienter with regard to admitting allegedly unqualified students. *See Burlington Coat Factory*, 114 F.3d at 1418.

### d. Permitting Ineligible Students to Apply for Title IV Financial Aid

With regard to Relators' allegations that TCI permitted inelegible students (including illegal aliens) to apply for Title IV financial aid, Relators plead no specific facts to support this allegation. Although Relator's Affidavit identifies one TCI graduate who was discovered to be an illegal alien by her employer, neither the SAC nor the Affidavit allege that TCI knew of this fact at the time it admitted this student, or that the mere admission of this student violated TCI's PPA requirements. Moreover, the SAC fails to allege circumstantial facts enabling the inference that TCI acted with scienter in assisting ineligible students apply for Title IV financial aid. *See Burlington Coat Factory*, 114 F.3d at 1418.

### e. False Certification of Compliance with Incentive Compensation Plan

With regard to Relators' claim that TCI adopted compensation policies that rewarded higher enrollments in violation of Title IV's incentive compensation ban, Relators attached examples of TCI's compensation plan to the SAC. Defendants argue that the compensation plans are protected by regulatory safeharbor because the compensation plan was not based solely on enrollment practices covered by the ban. As a matter of law, the Court agrees with Defendants.

While the incentive compensation ban prohibits Title IV-participating institutions from "provid[ing] any commission, bonus, or other incentive payment based directly or indirectly upon success in securing enrollments or financial aid to any person or entity engaged in any student recruiting or admission activities," 20 U.S.C. § 1094(a)(20), 31 C.F.R.

20

§ 668.14(b)(22)(i), federal regulation permits:

> The payment of fixed compensation, such as a fixed annual salary or a fixed hourly wage, as long as that compensation is not adjusted up or down more than twice during any twelve month period, and any adjustment is not based solely on the number of students recruited, admitted, enrolled, or awarded financial aid.

31 C.F.R. § 668.14(b)(22)(ii)(A).  Although the language of the safeharbor provision appears at odds with the incentive compensation ban, it stands to reason that an institution adhering to a federal regulation defining the contours of permissible compensation under the incentive compensation ban cannot have the requisite scienter to violate the ban.  *See, e.g.*, *United States ex rel. Bott v. Silicon Valley Colleges*, 262 F. App'x 810, 812 (9th Cir. 2008); *United States ex rel. Lee v. Corinthian Colleges*, No. 07-1984, 2009 WL 4730890, at *4 (C.D. Cal. Dec. 4, 2009). Relators do not allege that TCI based its compensation practices solely on means prohibited by the Title IV ban, and the examples provided with the SAC demonstrate that TCI's compensation scale complied with the regulatory safeharbor.  (*See* SAC, Ex. F, Pts. 25 (basing performance evaluation not only on enrollment starts, but student retention, success at recruiting activities, and administrative tasks), 26–27 (basing compensation not only on enrollment starts, but student retention, success at recruiting activities, administrative records-keeping, and professionalism).)

The SAC does not allege with particularity examples of other prohibited compensation practices not covered by the safeharbor, and the SAC further fails to allege circumstantial facts enabling the inference that TCI acted with scienter by falsely certifying compliance with Title IV's incentive compensation ban.  *See Burlington Coat Factory*, 114 F.3d at 1418.

### f.  Conspiracy to Commit the Above Violations

Lastly, the Court considers Relators' claim that TCI conspired with its corporate parents

to commit the above violations.  Defendants argue, and the Court agrees, that the law deems a parent corporation and its subsidiaries "legally incapable of forming a conspiracy with one another."  *Fogie v. THORN Ams., Inc.*, 190 F.3d 889 (8th Cir. 1999) (applying parent-subsidiary conspiracy rule, pronounced by the Supreme Court in the context of the Sherman Act, *see Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 777 (1984), to claims arising under RICO).   However, even if the law permitted a conspiracy claim to lie solely between a parent corporation and its subsidiary, Relators have not plead a plausible conspiracy claim against TCI and its parent corporations. Other than conclusory assertions that HTI provided false statements for TCI's placement records and participated in the submission of false placement records to TCI's accreditation agency, the SAC does not provide particularized allegations that TCI had an agreement with any of its corporate parents that it would use a false record or statement that " would have a material effect on the Government's decision to pay the false or fraudulent claim."  *See Allison Engine*, 128 S.Ct. at 2130.  Further, as explained *supra*, Relators have not identified with particularity any intentional falsehoods in the attached placement statements.

*     *     *

To summarize, Relators' primary allegations of fradulent misconduct against TCI lack sufficient particularity to satisfy Federal Rule of Civil Procedure 9(b).  Perhaps in recognition of these deficiencies, Relators ask this Court to ease Rule 9(b)'s pleading requirements, arguing that Defendants retain control over key information supporting their claims.  Relators correctly note that courts will "relax" the particularity requirements of Rule 9(b) "when factual information is peculiarly within the defendant's knowledge or control," *Craftmatic Sec. Litig.*, 890 F.2d at 645

22

(collecting cases), but "even under a non-restrictive application of the rule, claimants must allege that the necessary information lies within defendants' control, and their allegations must be accompanied by a statement of the facts upon which the allegations are based," *id.* (collecting cases).  However, Relators' argument is undermined by the fact that they have had access for the past two years to voluminous records concerning TCI's employment placement statistics (including the records submitted as Exhibits to the SAC) courtesy of the Government's 2007 subpoena.  Relators do not explain how the additional discovery they seek will enable them to cure the above pleading deficiencies.  Because Defendants have not stated plausible False Claims Act claim against TCI, the Court will dismiss all such claims (SAC, Counts I–III) pursuant to Federal Rules of Civil Procedure 9(b) and 12(b)(6).

   B.  *Piercing the Corporate Veil & Successor Liability*

   Because Relators have not sufficiently alleged that TCI violated the False Claims Act, and because Relators do not aver that The Chubb Corporation, Chubb America Service Corporation, and/or HTI themselves violated the False Claims Act, no claims remain for the imposition of liability upon TCI's corporate parents.[15]  However, *assuming arguendo* that Relators sufficiently alleged False Claims Act violations committed by TCI, the allegations contained in Relators' SAC fail to state veil-piercing and successor liability claims against The Chubb Corpration and HTI.

_____

   [15]Although Defendant Chubb America Service Corporation does not join the current motions, the SAC only seeks to impose liability against this Defendant on the basis of its veil-piercing claim, a derivative claim.  (*See* SAC Count IV, ¶ 100–04.)  In the absence of a properly pled claim against TCI, Relators may not impose liability on a purported corporate parent such as Chubb America Service Corporation.  Accordingly, this Count will be dismissed as against both The Chubb Corporation and Chubb America Service Corporation.

23

### 1. Veil-Piercing

Because veil-piercing is a state-law claim, the Court must apply the alter ego framework of the state(s) in which The Chubb Corporation and HTI are incorporated. *See, e.g.*, *In re Cambridge Biotech Corp.*, 186 F.3d 1356, 1376 n.11 (Fed. Cir. 1999); *Stromberg Metal Works, Inc. v. Press Mech., Inc.*, 77 F.3d 928, 933 (7th Cir. 1996). The SAC alleges that The Chubb Corporation was incorporated in New Jersey, and the parties appear to agree that New Jersey law governs Relators' veil-piercing claim against it. With regard to HTI, however, the SAC only avers that HTI has a principal place of business in Arizona, leading this Court to believe that Arizona law may govern this veil-piercing claim. However, the Court need not definitively decide which jurisdiction controls this claim, because the Court agrees with Defendants that Arizona law does not materially differ from New Jersey law as it applies to Relators' pleadings.

As in other jurisdictions, it is well-established in New Jersey "that a corporation is a separate entity from its shareholders, and that a primary reason for incorporation is the insulation of shareholders from the liabilities of the corporate enterprise." *State, Dep't of Envtl. Prot. v. Ventron Corp.*, 94 N.J. 473, 500 (1983) (citations omitted). This limited-liability principle—known as the corporate veil—applies to corporate shareholders as well. *Id.* In the parent-subsidiary context, New Jersey law permits courts to "pierce the corporate veil" where the subsidiary is shown to be the alter ego, or "mere instrumentality," of the parent corporation. *Id.* at 500–01. Alter ego liability attaches where "the parent [corporation] so dominated the subsidiary that it had no separate existence but was merely a conduit for the parent." *Id.* at 501 (citation omitted); *accord Gatecliff v. Great Republic Life Ins. Co.*, 821 P.2d 725, 729 (Ariz. 1991) (applying Arizona law). Yet, "[e]ven in the presence of corporate dominance, liability

24

generally is imposed only when the parent has abused the privilege of incorporation by using the subsidiary to perpetrate a fraud or injustice, or otherwise to circumvent the law." *Ventron*, 94 N.J. at 501 (citations omitted); *see also Craig v. Lake Asbestos of Quebec, Ltd.*, 843 F.2d 145, 150 (3d Cir. 1988) ("It is patently clear since *Ventron* that in New Jersey even the exercise of significant control by the parent over the subsidiary will not suffice to pierce the corporate veil.").

"In order to state a claim for piercing the corporate veil under New Jersey law, a plaintiff must show that: (1) one corporation is organized and operated as to make it a mere instrumentality of another corporation, and (2) the dominant corporation is using the subservient corporation to perpetrate fraud, to accomplish injustice, or to circumvent the law." *Bd. of Trs. of Teamsters Local 863 Pension Fund v. Foodtown, Inc.*, 296 F.3d 164, 171 (3d Cir. 2002) (citation omitted); *cf. Gatecliff*, 821 P.2d at 728 (recognizing that veil-piercing in Arizona requires a showing of "(1) unity of control and (2) that observance of the corporate form would sanction a fraud or promote injustice.") (citations omitted).  Relevant considerations to the veil-piercing analysis include

> gross undercapitalization . . . failure to observe corporate formalities, non-payment of dividends, the insolvency of the debtor corporation at the time, siphoning of funds of the corporation by the dominant stockholder, non-functioning of other officers or directors, absence of corporate records, and the fact that the corporation is merely a facade for the operations of the dominant stockholder or stockholders.

*Foodtown*, 296 F.3d at 172 (citations and internal quotation marks omitted) (applying New Jersey law); *cf. Deutsche Credit Corp. v. Case Power & Equip. Co.*, 876 P.2d 1190, 1195–96 (Ariz. Ct. App. 1994) (identifying similar relevant factors under Arizona law).  Without more,

25

neither stock ownership (majority or complete) nor overlapping boards of directors suffice to establish an alter ego relationship.  *E.g.*, *Ramirez v. STi Prepaid LLC*, 644 F. Supp. 2d 496, 507 (D.N.J. 2009) (applying New Jersey law); *Horizon Res. Bethany Ltd. v. Cutco Indus.*, 881 P.2d 1177, 1180 (Ariz. Ct. App. 1994) (applying Arizona law); *see also United States v. Bestfoods*, 524 U.S. 51, 69 (1998); *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 484–85 (3d Cir. 2001).

### a.  The Chubb Corporation

With regard to The Chubb Corporation, Relators allege that The Chubb Corporation founded TCI in 1970 to train employees for its computer center,[16] and that TCI was a subsidiary of The Chubb Corporation until The Chubb Corporation sold TCI to co-Defendant HTI in 2004. (SAC ¶¶ 6–7, 26.)  Under its veil-piercing claim in Count IV, Relators further aver that The Chubb Corporation and Chubb Services Corporation both (i) "exclusively controlled" and "managed" TCI; (ii) that they received reports from TCI; (iii) that they "directly benefitted" from the federal funds obtained by TCI; (iv) that they used TCI as an alter ego; (v) that they "were aware of and had complete control of the fraud committed by [TCI];" and (vi) that they "created this corporate structure to avoid [their] duties to consumers and to shelter [their] wrongdoings from judicial or administrative oversight."  (*Id.* ¶¶ 100–105.)  These boilerplate allegations, which presume the legal conclusion that TCI was The Chubb Corporation's alter ego, do not

---

[16]Relators base this allegation on a statement that purportedly appeared on TCI's website on or about the time this case was filed.  (*See* SAC ¶ 26 (averring that TCI's website contained the following statement: "In 1970, one of the largest insurance organizations in the world needed qualified people to run its multimillion dollar computer center.  Not able to find skilled employees, it created its own training center.  This proved so successful that [other companies] soon asked [TCI] to provide them with computer professionals.  And so [TCI] was born").)

speak to the factors identified by the Third Circuit for determining whether a subsidiary is the mere instrumentality of the parent.  Relators do not allege that TCI was grossly undercapitalized, failed to observe corporate formalities, had non-functioning directors, or that it commingled funds with either of its parent corporations.  Instead, Relators contend that The Chubb Corporation should be liable because it was the "sole owner and beneficiary" of TCI's alleged false claims.  (Relators' J. Opp'n Br. at 23.)  Yet courts in New Jersey have consistently rejected imposing alter ego liability solely on this basis.  *E.g.*, *Ramirez*, 644 F. Supp. 2d at 508 (finding allegations that a parent corporation owned a controlling interest in its subsidiary and shared upper management with its subsidiary insufficient to state a valid veil-piercing claim); *Premier Pork L.L.C. v. Westin, Inc.*, No. 07-1661, 2008 WL 724352, at *7 (D.N.J. Mar. 17, 2008) (same).

Relators attempt to minimize these deficiencies in their opposition brief and in the declaration of counsel, which present the following new allegations not contained in the SAC: (i) that another corporation, Chubb Computer Services, Inc., owned all of TCI's stock in 2004; (ii) that *this* entity sold the shares to HTI in the 2004 sale of TCI; and (iii) that this entity had a common treasurer and secretary with The Chubb Corporation.  (Relators' J. Opp'n Br. at 7 (citing Green Decl., Exs. E, F).)  Relators' attempt to bolster their pleadings midstream is improper.  *See Burlington Coat Factory*, 114 F.3d at 1426 ("As a general matter, a district court ruling on a motion to dismiss may not consider matters extraneous to the pleadings.").  However, accepting these allegations for the sake of argument, the Court does not understand how they advance Relators' position.  Not only do these allegations add nothing to the claim that The Chubb Corporation dominated TCI, but they contradict the SAC's claim that The Chubb Corporation sold TCI to HTI in 2004.  If anything, the new allegations suggest that The Chubb

27

Corporation had a close working relationship with Chubb Computer Services, Inc., but the SAC does not allege that The Chubb Corporation had an alter ego relationship with this company.[17]

The SAC also falls short under the second prong of the Third Circuit's veil-piercing analysis, because Relators fail to plead The Chubb Corporation's role in TCI's alleged fraud with sufficient particularity. "When a cause of action seeks to pierce the corporate veil on the basis of fraud, it is subject to Fed. R. Civ. P. 9(b)." *Foodtown*, 296 F.3d at 172 n.10 (citing *Coyer v. Hemmer*, 901 F. Supp. 872, 883–84 (D.N.J. 1995)).  As noted above, the SAC fails to allege with sufficient particularity that TCI used false statements to fraudulently procure federal monies. The SAC provides no additional perspective on The Chubb Corporation's purported role in this scheme.  Construing the SAC in the light most favorable to Relators and accepting the additional facts asserted in Relators' brief, the SAC is bereft of allegations permitting an inference that The Chubb Corporation used TCI as a mere instrumentality to perpetrate fraud.

### b.  HTI

Turning to HTI, Relators advance *verbatim* the same veil-piercing allegations that they made about The Chubb Corporation that the Court considered above.  (SAC ¶¶ 107–12.) Relators also allege that Defendants submitted documents, letters, and reports to its accreditation agency at various dates between 2003 and 2005 that "contain[ed] willfully false statements made by [TCI] and The High Tech Institute" (*id.* ¶ 24(i)(a)), and that TCI and HTI "submitted these documents with the purpose of falsely obtaining accreditation and falsely entitling them to Title IV/HEA funding from the Department of Education" (*id.* ¶ 24(i)(b)).  Although the SAC does not

---

[17]In fact, it does not appear that the SAC even identifies this entity, lest this Court is to presume that Chubb Computer Services, Inc., is the same corporation as co-Defendant Chubb America Service Corporation.

appear to speak to the matter, Relators contend in their brief that HTI's chief executive officer also acted as an officer of TCI and submitted documents on their behalf to unspecified recipients. (Relators' J. Opp'n Br. at 30; *see also id.* at 7 (suggesting additional overlapping officers).) Finally, Relators allege that statements appeared on TCI's and/or HTI's website[18] proclaiming that HTI "added The Chubb Institute's eight locations to its list of 17 HTI campuses throughout the United States," and referring to TCI and/or TCI affiliates as "branch[] schools" and "part of the HTI family of schools."  (SAC ¶ 27; Relators' J. Opp'n Br. at 24.)

By themselves, the duplicated boilerplate allegations and the shared-corporate-officers allegations fail to state a claim with respect to HTI for the same reason that these allegations failed to state a claim against The Chubb Corporation.  *See Horizon*, 881 P.2d at 1180 (recognizing that, under Arizona law, "[A] mere showing that one corporation is owned by another or that the two share interlocking officers or directors is insufficient to support a finding of alter ego."); *accord Ramirez*, 644 F. Supp. 2d at 507 (applying New Jersey law).  The question remains whether Relators' additional allegations that HTI welcomed TCI into its "family of schools" and participated in the submission of false statements to TCI's accreditation agency sufficiently plead the unity of control and/or mere instrumentality status to state a claim for veil-piercing.  The Court finds that they do not.

With regard to the alleged website statements that TCI joined the HTI family of schools,

_____

[18]The Court notes that not all of these statements appear in the SAC, and the SAC indicates that one of the statements appeared on The Chubb Institute's website rather than HTI's website.  (*See* SAC ¶ 27.)  Further, although Relators attached printouts of portions of Defendants' respective websites, the Court has been unable to locate where each of these statements were made, and the websites referenced in the SAC appear to have changed since the time this lawsuit was filed.  For purposes of addressing Relators' argument, the Court will accept the alleged website statements as described in Relators' brief.

these statements do not permit the inference that TCI ceased operating as a distinct corporate entity.  The alleged statements do not suggest that TCI was grossly undercapitalized, failed to observe corporate formalities, had non-functioning directors, or that it commingled funds with either of its parent corporations.  Meanwhile, Relators' contention that HTI participated in the submission of false documents fails to state a plausible veil-piercing claim against HTI because the documents provided with the SAC do not support this contention.

As noted above, Relators included Exhibits A (2003 Placement Charts) and B (2004 Letter of Assurance and Interim Report) with the SAC to demonstrate Defendants' submission of false statements to their accreditation agencies.  The SAC avers that HTI either provided false statements and/or participated in the submission of these documents to the accreditation agency, but these documents do not bear any indicia of HTI approval or participation, and Relators do not explain which, if any, of the statements contained therein were attributable to HTI.  Moreover, because these allegations purport to speak for HTI's role in the fraudulent activity, they must comport with the heightened pleading requirements of Rule 9(b).  *See, e.g.*, *Foodtown*, 296 F.3d at 172 n.10.  As the Court explained with regard to Relators' claims against TCI, *see supra* Part III.A, Relators do not identify a single knowingly false statement among the voluminous statistics contained in these exhibits.  Thus, presuming that HTI submitted some of these documents to accreditation agencies and/or that HTI made some of the statements contained therein, Relators have not plead with particularity that HTI participated in the commission of fraud.

### 2. Successor Liability

Relators rely on the same veil-piercing allegations above (including the boilerplate allegations made against The Chubb Corporation and HTI) to present a claim for successor

liability against HTI.  (*See* SAC ¶¶ 114–19.)  However, the same allegations fair no better under New Jersey's law for successor liability.

The general rule in New Jersey is that "where one company sells or otherwise transfers all its assets to another company the latter is not liable for the debts and liabilities of the transferor." *Ramirez v. Amsted Indus., Inc.*, 86 N.J. 332, 340 (1981) (citations omitted).  Nevertheless, New Jersey law recognizes the following exceptions warranting the imposition of successor liability: "where (1) the purchasing corporation expressly or impliedly agreed to assume such debts and liabilities; (2) the transaction amounts to a consolidation or merger of the seller and purchaser; (3) the purchasing corporation is merely a continuation of the selling corporation, or (4) the transaction is entered into fraudulently in order to escape responsibility for  such debts and liabilities." *Id.* at 340–41 (collecting cases); *see also Colman v. Fisher-Price, Inc.*, 954 F. Supp. 835, 838 (D.N.J. 1996).  Relators contend that their allegations state a plausible claim under the merger and mere continuation theories.

The following considerations guide a court's determination of whether the sale of a corporation constitutes a *de facto* merger or mere continuation: "(a) continuity of management, personnel, physical location, assets, and general business operations; (b) a cessation of ordinary business and dissolution of the predecessor as soon as practically and legally possible; (c) assumption by the successor of the liabilities ordinarily necessary for the uninterrupted continuation of the business of the predecessor; and (d) continuity of ownership/shareholders." *Portfolio Fin. Servicing Co. ex rel. Jacom Computer Servs., Inc.*, 334 F. Supp. 2d 620, 625–26 (D.N.J. 2004); *see also Luxliner P.L. Export, Co. v. RDI/Luxliner, Inc.*, 13 F.3d 69, 73 (3d Cir. 1993).  All of the factors need not be present to demonstrate a *de facto* merger or mere

continuation, and "[t]he crucial inquiry is whether there was an 'intent on the part of the contracting parties to effectuate a merger or consolidation rather than a sale of assets.'" *Luxliner*, 13 F.3d at 73 (quoting *McKee v. Harris-Seybold Co.*, 109 N.J. Super. 555, 567 (App. Div. 1970)).

Here, Relators contend that HTI absorbed TCI by incorporating TCI's campuses into the "HTI family of schools." (Relators' J. Opp'n Br. at 27.) Relators further argue that HTI's assumption of TCI's liabilities "is clear on its face—the obligations for accreditation and revenue requirements, obligations to vendors, teachers and administrators have all undeniably passed to the new entity going forward." (*Id.*)[19] Unfortunately, these conclusory assertions are not supported by the pleadings.

The SAC avers that HTI is the successor corporation to TCI (SAC ¶ 119), but Relators concede that HTI purchased TCI from Chubb Computer Services, Inc. (Relators' J. Opp'n Br. at 27).[20] Relators also appear to concede that HTI did not purchase TCI's assets. (Relators' J. Opp'n Br. at 27 (explaining that the 2004 sale of TCI "was a stock purchase, not an asset purchase").) With regard to the purportedly merged entity, the SAC does not allege that TCI has ever ceased operations as a distinct corporate entity, and Relators concede that TCI continued to operate at the "same campus locations" under the same "Chubb brand" after the stock sale,

[19]The Court understands Relators to argue that the purchase of stock necessarily entails an assumption of the corporation's debts and obligations. This argument flies in the face of the corporate veil doctrine, which presumes, with limited exceptions, "that a corporation is a separate entity from its shareholders, and that a primary reason for incorporation is the insulation of shareholders from the liabilities of the corporate enterprise." *Ventron*, 94 N.J. at 500.

[20]As previously noted, the SAC does not identify Chubb Computer Services, Inc., and Relators do not suggest that this entity merged with HTI.

"albeit within the HTI 'family' of schools."  (Relators' J. Opp'n Br. at 26, 27.)  Furthermore, the SAC neither alleges that HTI's purchase of TCI maintained continuity in shareholders (i.e., that HTI exchanged shares for TCI's assets), nor that HTI expressly or implicitly agreed to assume TCI's debts and obligations.  In the absence of such allegations, Relators cannot plausibly claim that HTI and Chubb Computer Services, Inc. intended to merge TCI into HTI when the latter sold its shares of TCI stock.

## III.   LEAVE TO AMEND

The Court notes that Relators have already amended the original Complaint twice.  It also appears that, courtesy of a Government subpoena served in 2007, they have had access to a considerable amount of records providing TCI's employment placement statistics for the years 2003–2005, which included student and employer contact information, as well as all TCI submissions to accreditation agencies.  (*See* SAC Exs. A–E; TCI & HTI Reply Br. at 1.)  Despite having had access to this information for more than two years, Relators still have not pled plausible causes of action for a False Claims Act violation, piercing the corporate veil, or successor liability.  Further, Relators do not seek leave to amend the SAC to cure their pleading deficiencies.

Federal Rule of Civil Procedure 15(a) provides that "leave [to amend] shall be freely given when justice so requires," and the Third Circuit has recommended granting leave to amend unless amendment would be futile, prejudicial to a party, or dilatory, *see In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997).  It may well be that further amendment would be futile; however, the Court will give Relators an opportunity to explain otherwise.  For the time being, the Court will dismiss the claims presented in the Second Amended Complaint

without prejudice, and the Court will give Relators 30 days from the receipt of the accompanying Order to show cause as to why they should be granted leave to amend the Complaint for a third time.  Pursuant to the Government's continuing authority under 31 U.S.C. § 3730, the Court will require Relators to provide the Government a copy of any such reasons within the time allotted to show cause.

## IV.    CONCLUSION

For the aforementioned reasons, the Court will grant The Chubb Corporation's motion (Doc. No. 38) to dismiss, as well as the motion (Doc. No. 39) to dismiss filed by TCI and HTI. Relators' Second Amended Complaint will be dismissed in its entirety without prejudice.  An appropriate form of order accompanies this Memorandum Opinion.  Relators will have thirty (30) days from the filing of the accompanying Order to show cause for why they should be granted leave to amend the Second Amended Complaint.


Dated: March 22, 2010

_____ /s/ Garrett E. Brown, Jr._____
GARRETT E. BROWN, JR., U.S.D.J.